STATE EX REL. MILLER, Attorney General, et al. v. HALL, Secretary of the State of North Dakota, Gunder Olson, Treasurer of the State of North Dakota, and Carl Jorgenson, Auditor of the State of North Dakota, as Commissioners of Public Printing in and for the State of North Dakota, and the Journal Publishing Company of Devils Lake, North Dakota, Intervener.

(141 N. W. 124.)

**Attorney general as relator — refusal of use of name — citizens — taxpayer — action.**

1. When the attorney general refuses to consent to the use of his name as a relator, in an action brought to enjoin certain state officials from proceeding under a contract, under which it is claimed work contracted for therein is being

done contrary to the express terms of a statute on the subject, a citizen and taxpayer of the state may maintain such action as relator and in the name of the state.

**Contract — lease — character of instrument.**

2. Although a contract is termed a lease by the parties thereto, and is so mentioned in the contract itself, its character is not thereby established, but must be determined from its terms and conditions rather than from the name applied to it by the parties.

**Contract — material — sale — state printing.**

3. A contract set out in the body of this opinion considered, and *held* to be a contract for the sale of material, the furnishing of labor, the renting of printing machinery and other property necessary to the conduct of a printing plant, the use of floor space, etc., to enable the party of the second part to do certain state printing, binding, etc., in the city of Bismarck; and that on its face it does not disclose that it was intended by the parties as an evasion of the statute, chapter 185, Laws of 1907, requiring certain state printing to be done only by established and qualified printing and publishing houses that have been established and in continuous business in this state not less than one year.

**Contract — evidence — evasion.**

4. The facts surrounding the information of the Dakota Stationery & Printing Company, a North Dakota corporation, and the negotiations and execution of a contract between it and the Journal Publishing Company, of Devils Lake, which has the contract for certain classes of state printing, and the dealings between said parties, are examined in this opinion, and *held* not to warrant this court in holding that the contract above referred to between said printing companies was intended or used for the purpose of evading the provisions of chapter 185, Laws of 1907, above referred to, or in violation thereof.

Opinion filed April 7, 1913.

Appeal from a judgment of the District Court for Burleigh County; *Nuessle,* J.

Affirmed.

Statement by SPALDING, Ch. J.    This action was brought in the district court of Burleigh county, in the name of the state on the relation of the attorney general, and S. F. Knight, against the secretary of state, state treasurer, state auditor, as the commissioners of public printing, for the state, for the purpose of enjoining and restraining the defendants from delivering to the Dakota Printing & Stationery Com-

pany, a corporation, of Bismarck, North Dakota, any of the public print-
ing within the third and fourth classes, and from paying or approving,
or authorizing the payment of, any bills or expenses incurred by reason
of doing public printing of those classes by said Dakota Printing & Sta-
tionery Company; and to have a certain contract which had been en-
tered into on behalf of the state by the commissioners of public printing
and the Journal Publishing Company, of Devils Lake, North Dakota,
canceled and set aside. In brief, the complaint alleges that Andrew
Miller is the lawful, qualified, and acting attorney general of the state,
and that the relator, Knight, is a citizen and taxpayer of the county of
Cass. It then alleges the execution of a contract between the defend-
ants, the Commissioners of public printing, on or about the 1st day of
August, 1912, with a domestic corporation known as the Journal Pub-
lishing Company of Devils Lake, under and by virtue of the provisions
of Article 4, chapter 2, of Rev. Codes 1905; and that said contract re-
lates to and covers the third and fourth classes of printing as defined
in said article; that on or about September 3, 1912, the Dakota Print-
ing & Stationery Company, a domestic corporation, was organized to do
a general publishing and printing business, and has been established in
such business only since the month of September, 1912; that the princi-
pal place of business and office of the journal company is at Devils Lake;
that the Dakota Company has entered into no contract with said de-
fendants or the state for the doing of any public printing whatsoever;
that the only contract relating to public printing of the third and fourth
classes with the state is with the journal company; that said defend-
ants, notwithstanding the provisions of article 4 of chapter 2, Rev.
Codes 1905, and of § 49 of said article, and the provisions of § 2282,
Rev. Codes 1905, as amended by chapter 185, Laws of 1907, have been
and now are delivering public printing of the third and fourth classes
to the Dakota Priting & Stationery Company, and that all of such
classes of printing that have been done since the 3d day of September,
1912, have been done by said Dakota Printing & Stationery Company;
and that defendants, unless restrained, intend to continue to deliver
to said Dakota Company all the balance of the third and fourth classes
of printing, and to have it done by said Dakota Company, and to allow
and pay said Dakota Company for such work; that the petitioner has
demanded from the commissioners of public printing that they cease

and desist from delivering said third and fourth classes to said Dakota company, and has advised such commissioners that to so deliver is in violation of the contract existing between the state and the journal company and of the law, but that said commission has wholly refused to cease and desist from so doing, and that relator is advised by said board that it intends to have all printing within the third and fourth classes of printing done by said Dakota company unless restrained; that said Dakota company is not a qualified and established printing and publishing house within the state, and has not been conducting a printing and publishing business within the state for more than a year; that such delivery of printing of said classes to the Dakota company has been done at the request and with the approval of the said journal company, which has not done or performed any of its duties under the contract referred to, but that, through collusion and agreement between said journal company and said Dakota company, such printing is being done by said Dakota company; that the petitioner has no speedy and adequate remedy at law; that he has applied to the attorney general, and demanded that he bring and prosecute an action to restrain defendants from continued violation of law in relation to such printing, but that the attorney general has refused so to do.

The defendants answered, and the Journal Publishing Company of Devils Lake, by leave of court, intervened and filed a complaint in intervention, wherein it alleged that it had been for more than seven years a corporation, duly organized and existing under the laws of the state of North Dakota, with its office and principal place of business at Devils Lake; that it has a well-equipped and appointed plant for doing all classes of printing in a prompt, careful, and efficient manner; that the printing commission, on the 30th of July, 1912, pursuant to bids requested and obtained in the manner provided by law, accepted the bids of, and entered into four separate contracts with the intervener, covering the first four classes of public printing required by the state for the two years commencing January 1, 1913; and that said intervener, upon being awarded such contract, qualified as a public printer for the state in the manner provided by law, and entered upon the discharge of its duties, and has, ever since, continued to carry out the provisions of said contract; that in order to better facilitate the performance of its duties as public printer for the state, and especially

as to promptly printing bills introduced into the legislative assembly and the journals of the house and senate, the intervener, on December 1, 1912, leased the equipment of the Dakota Printing & Stationery Company in Bismarck for the two years referred to, its printing and binding machinery, fixtures, presses, etc., and all machinery and apparatus that may be required by said journal company in carrying out the provisions of its contracts with the state; and that by such lease it was agreed between the parties thereto that the Journal Publishing Company should have sole and exclusive use of all such machinery and materials contained in the plant of the Dakota company whenever the journal company might so desire; and that thereby the Dakota company agreed to furnish all help required to operate such machinery and printing apparatus, while in the use of said journal company, required to carry out its contract with the state; that under such lease the journal company has dominion and control over the necessary printing apparatus and the equipment in the city of Bismarck to properly carry out all the provisions of this contract with the state; that after the journal company had qualified, it entered upon the discharge of its duties as public printer, and had ever since continued to perform them in accordance with the contract; that the commissioners of public printing delivered to the journal company all printing required. to be done for the state embraced within said four classes, and to no other person or persons, except such as was unlawfully delivered to the relator, Knight; that such printing was received by said journal company, from time to time, as delivered by the defendants, and properly done; that the defendants are delivering to said journal company public printing pursuant to said contracts therewith, and not otherwise; that the intervener intends to perform all the work under such contracts in accordance therewith, and that most of the third and fourth classes are intended to be done and performed at its plant in the city of Devils Lake; that no such printing of the third and fourth classes had ever been delivered to the Dakota Printing & Stationery Company, but that it had been delivered to said journal company and by it done in compliance with its contract.

The answer of the defendants is the same as the complaint of the intervener, except that it states that it is the intention of defendants to continue to deliver to the Journal Publishing Company all the bal-

ance of the printing provided for in its contracts with the state, at the times and in the manner and upon the conditions specified in said contracts, and not otherwise. The contract referred to between the two printing companies is as follows:

This Agreement, made this 1st day of December, A. D. 1912, by and between the Dakota Printing & Stationery Company, a corporation, of Bismarck, North Dakota, party of the first part, and the Journal Publishing Company, a corporation, of Devils Lake, North Dakota, party of the second part;

Witnesseth, That, Whereas, the party of the second part has entered into a certain contract with the state of North Dakota to do for the said state of North Dakota all the first, second, third, and fourth class printing required to be done by the state of North Dakota during the biennial period beginning January 1, 1913, and Whereas, the party of the second part desires to secure and have the use of certain printing and binding machinery in the city of Bismarck, North Dakota, during the said biennial period;

The said party of. the first part hereby covenants and agrees to and with the said party of the second part, for the consideration hereinafter named, to let and lease to the party of the second part during the biennial period beginning January 1, 1913, and ending December 31, 1914, the following described printing and binding machinery, apparatus, and fixtures which the said party of the first part agrees to have at such times as said party of the second party may require the use of the same in the city of Bismarck, North Dakota; all presses, paper cutters, stitchers, binding machinery, stones, stands, racks, type, reglet, and all machinery and apparatus that may be required by said Journal Printing Company in carrying out the provisions of its said certain contract with the state of North Dakota for printing, publishing, and binding for the said state of North Dakota, the first, second, third, and fourth classes of printing during the biennial period beginning January 1, 1913, and ending December 31, 1914.

And it is hereby covenanted and agreed by and between the parties hereto that the said Journal Publishing Company, party of the second part, shall have the sole and exclusive use of all of said machinery and materials whenever it may so desire at any time of day or night during

said biennial period, and it is further conditioned that the party of the first part is privileged to use said machinery and material at any time when the same are not in use by the party of the second part; and the party of the first part hereby agrees to furnish all help which may be required to operate said machinery and printing apparatus while in use by the party of the second party, and to carry in stock and to furnish all materials to the party of the second part as may be required in carrying out the provisions of said contract with the state of North Dakota at cost price plus 10 per cent for said materials and labor so furnished, and the party of the second part hereby covenants and agrees to pay to the party of the first part for the rental and use of said machinery, apparatus, and fixtures furnished, in addition to the price of the cost of materials and labor furnished plus 10 per cent the sum of two hundred fifty dollars ($250) per month;

And it is further covenanted and agreed that the party of the second part shall pay, at the end of each month, the said agreed price for materials and labor furnished by the party of the first part to the party of the second part, and the said sum of two hundred fifty dollars ($250) monthly rental.

In witness whereof the parties hereunto have set their hands and seals the day and date first above written.

Dakota Stationery & Printing Company, Signed, sealed, and delivered in presence of

By Lee F. Warner, Its Vice President,
By E. H. Dummer, Its Secretary,

Eugene D. Nims,
Ed. Morgan.

Journal Publishing Company,
By J. H. Bloom, its Manager,
empowered to make and enter into
all contracts and agreements,

(Seal)                    By .................... Its Secy.

A trial was had in the district court, and findings made and judgment entered dismissing the action, both on the facts and because the court found the law referred to, namely chapter 185, Laws of 1907, unconstitutional. All the evidence is before us, and we are required to

try the case *de novo*. Chapter 185, Laws of 1907, requires all state, county, and other public printing, binding, and blank book manufacturing, etc., to be done only by established and qualified printing and publishing houses that shall have been established and in continuous business in this state not less than one year. It contains numerous other provisions, which are not material to the determination of this appeal. The testimony taken occupies a great deal of space, and we think to set it out in full would be useless, and we content ourselves with now stating in general what it shows. In our opinion other parts will be referred to.

At the time of entering into the contract with the state the journal company maintained, and had for more than a year theretofore, a plant at Devils Lake, adequate and suitable to do the state printing of the classes mentioned, but that the printing of the first and second classes had to be done largely during the sixty days' session of the legislature, and much of it had to be completed and delivered within twenty-four hours after the copy was received. These facts made it impracticable for the journal company to do those classes of work in Devils Lake. It, therefore, in order to comply with its contract, had to provide a suitable plant in the city of Bismarck, and it did this by means of the contract above set out. The record shows that, at the time of the trial, no third or fourth class matter had been done in Bismarck, except a trifling amount, which formed an exception to the requirements of the contract. The relation between the parties who incorporated the Dakota Company, and J. H. Bloom, principal owner and manager of the journal company, is also shown. Bloom also owned one thirtieth part of the capital stock of the Dakota company, and had more or less to do with the organization of that corporation. All the printing of each of the four classes that had been done at the time of the trial had been delivered to Bloom as the manager of the journal company, and receipted for by him in the name of the journal company. Seven thousand dollars had been advanced on an estimate, and warrants for that amount drawn to the journal company, and delivered to Bloom. That amount was thereafter by him paid to the Dakota company under their contract. This sum was considerable less than the total amount due for printing done. Bloom testified that his plant at Devils Lake was ample to do the third and fourth class printing,

and that it was his intention to do the greater portion of those classes in the Devils Lake plant. He was not inquired of, and did not testify; and there is no evidence in the record as to where any part of the third and fourth classes not done at Devils Lake will be done. The relator contends that all the circumstances surrounding all the transactions related in the record, and the character of the so-called lease, are such as to require the court to find that such lease is but a makeshift to enable the Dakota company to do the public printing of the third and fourth classes in violation of law; that in fact the Dakota company is doing, and will do such printing, rather than the journal company. On the other hand, it is contended that the reason for the Dakota company entering upon the scene is as stated above; namely, that the necessities regarding the legislative printing would not admit of the time being used between its receipt and delivery necessary to send it to Devils Lake and get it back to Bismarck in time for legislative use, and that, while the Journal company is not only doing and proposing to do the greater portion of the work at Devils Lake, if any of it is done at Bismarck it is in fact and in law done by the journal company, and not by the Dakota company. The first and second class printing, which include the legislative printing, are not involved in this action, it being conceded that the state has a right to let that to outside printers in certain conditions which existed when the work was let to the journal company.

Barnett & Richardson and Lawrence & Murphy, for appellants.

The relator, a citizen and taxpayer, may maintain this action. A taxpayer can bring and maintain an action to restrain the illegal payment of public funds. Weatherer v. Herron, 25 S. D. 208, 126 N. W. 244; Frame v. Felix, 167 Pa. 47, 27 L.R.A. 803, 31 Atl. 375; State ex rel. McCue v. Blaisdell, 18 N. D. 55, 24 L.R.A.(N.S.) 465, 138 Am. St. Rep. 741, 118 N. W. 141.

The legislature has power to require the state printing to be done within the state. Tribune Printing & Binding Co. v. Barnes, 7 N. D. 591, 75 N. W. 904.

Statutes must be construed with reference to the legislative intent and to the object intended to be accomplished. People v. Dana, 22 Cal. 11.

An agreement to contravene a statute, in fraud of the public or to the injury of private parties, savors of a conspiracy. Collins v. Blantern, 2 Wils. 341; Blasdel v. Fowle, 120 Mass. 447, 21 Am. Rep. 533; Brooks v. Cooper, 50 N. J. Eq. 761, 21 L.R.A. 617, 35 Am. St. Rep. 793, 26 Atl. 978; People v. Soule, 74 Mich. 250, 2 L.R.A. 496, 21 N. W. 908; Thomp. Corp. p. 35; Kendall v. Klapperthal Co. 202 Pa. 596, 52 Atl. 92.

*Andrew Miller,* Attorney General, and *John Cormady, Alfred Zuger,* and *C. L. Young,* Assistants Attorney General, for respondents.

The relator cannot maintain this action, because the rights sought to be secured are merely private, and he having failed to show that his individual interest is affected in some way peculiar to himself. He has no interest different from that of any other taxpayer. State ex rel. Dakota Hail Asso. v. Carey, 2 N. D. 36, 49 N. W. 164; Carter v. State, 8 S. D. 153, 65 N. W. 422; Leader Printing Co. v. Lowry, 9 Okla. 89, 59 Pac. 242; Devlin v. New York, 63 N. Y. 8; Anderson v. DeUrioste, 96 Cal. 404, 31 Pac. 266; Rev. Codes 1905, Sec. 5226.

Chapter 185, Laws of 1907, is unconstitutional and void as against public policy. Van Harlingen v. Doyle, 134 Cal. 53, 54 L.R.A. 771, 66 Pac. 44; State v. Pennoyer, 65 N. H. 113, 5 L.R.A. 709, 18 Atl. 878; Evansville v. State, 118 Ind. 426, 4 L.R.A. 93, 21 N. E. 267.

The case of Tribune Printing & Binding Co. v. Barnes, 7 N. D. 591, 75 N. W. 904, cited by appellant—differentiated.

The title to this law is too narrow to cover the subjects embraced within the body of the act, because, in addition to prescribing the qualifications of printers, it seeks to guard against illegal combinations in bidding, etc. Sutherland, Stat. Constr. § 87; State ex rel. Standish v. Nomland, 3 N. D. 427, 44 Am. St. Rep. 572, 57 N. W. 85.

SPALDING, Ch. J. It is first contended that the plaintiff-relator cannot maintain this action, for the reason that the rights sought to be secured are private only. We are of the opinion that the relator is qualified to bring this action. He is interested as a taxpayer and as a citizen, and it would seem that there must be someone who may champion the interests of the state in case the attorney general, as in this case, refuses to do so. We need not discuss the subject further, because we have so recently passed upon it in State ex rel. McCue v.

Blaisdell, 18 N. D. 55, 24 L.R.A.(N.S.) 465, 138 Am. St. Rep. 741, 118 N. W. 141. See also Frame v. Felix, 167 Pa. 47, 27 L.R.A. 803, 31 Atl. 375, which is directly in point.

2. We will next consider what character is impressed upon this contract on its face. Is it a lease or is it virtually an assignment of the contract between the state and the journal company? Is it a hiring by the journal company of the work done, or is it a contract for the hiring of the use of the machinery belonging to the Dakota company, a contract for the purchase of material from it, and a contract by the Dakota company to furnish these things and the help necessary to do the work? It is immaterial what the contract is denominated by the parties, as its terms and conditions, rather than the name applied to it, must govern. If it is a lease, or if it is a contract for the use or hiring of machinery, purchase of material, and to furnish these things and the help, it is evident that, as far as it discloses on its face, it could be entered into lawfully by the parties without affecting the contract between the journal company and the state, or the rights of the state or any citizen within it. On the other hand, if it is merely a subterfuge or a device to cover up the real intent of the parties, and is, in fact, only a method of transferring the doing of the work from the journal company to the Dakota company, then work of the third and fourth classes done under it must be done in violation of the terms of chapter 185, Laws of 1907. It is apparent on the face of it that it provides for the use by the journal company of the presses and machinery, etc., belonging to the Dakota company. It is clearly apparent that it is an agreement on the part of the Dakota company to sell to the journal company material for its use in carrying out these contracts. The journal company is given possession of all the property that it requires for its use during the two years covered by the contract, at all times, day or night, when it has use for it and desires to use it. It has possession at all such times to the exclusion of the Dakota company. The fact that the Dakota company may have the right to use the plant when the journal company has no use for it, and it would otherwise be idle, as far as we are able to see, in no manner casts a cloud of suspicion upon the intent of the parties in entering upon the contract. The journal company did not make the contract cover miscellaneous work for outside parties; it only covers the state work, and this pro-

vision for the Dakota company using the plant when not in use by the journal company was undoubtedly made in contemplation of the journal company not having work to employ the plant, or all of it, during the entire period covered by the contract. It cannot prejudice the journal company to have it in use by the Dakota company during such times as the plant would otherwise remain idle; and we see nothing in this proposition that in any way militates against the construction that, so far as the plant is concerned, it is a hiring by the journal company. As to the purchase of material, it will be noticed that the contract requires the Dakota company to carry in stock and furnish to the journal company the material, which we suppose includes printing paper, leather used in binding, and other material entering into the manufacture of pamphlets and such books as are required by the state within these classes. The journal company is not a manufacturer of material, and it has to purchase it somewhere and of someone. To carry in stock the amount of material of this nature required for the state printing manifestly requires considerable capital,—possibly capital in excess of that of the journal. As to this we are not informed. It must be of considerable advantage to the journal company to have the stock available in Bismarck, and thereby avoid the delay which would at times occur if compelled to order from jobbing points. For these reasons the allowance of 10 per cent which is provided for in the contract on such material does not seem to us, on its face, to be so large as to alone cast suspicion upon the parties or their contract.

The most difficult question relates to the furnishing of the help, which we assume includes typesetters, machine operators, such binders as may be necessary, etc. It is not perfectly clear that this contract might not be considered in respect to the help as providing simply for the Dakota company doing the work of the journal company, but when read in connection with the other provisions of the contract, particularly those relating to the material and the use of the plant, and considered in the light of well-known facts as they exist in the labor world, we think it entirely consistent with the theory that the employees when engaged on the work of the journal company are the employees of the latter. As far as indicated by the contract, at such times they are under the dominion and control of the journal company. There is nothing to disclose that the Dakota company directs the manner in which

the work shall be performed, the hours of employment, or assigns different workmen to different classes of work. It would rather appear that all this is done by the journal company. The contract in this respect does not materially differ from those engaging help in various employments through employment agencies or through the means of labor unions; and we are satisfied that the burden is on the relator to show that the employees are under the control and the direction of the Dakota company while doing the work, in order to prove his case. This he has not done. We may add that the contract in this respect is not so clear, but that evidence of the construction placed upon it by the parties would have much weight, but the burden is on the relator. We conclude that so far as the contract on its face is concerned it contains nothing inconsistent with the claims of the intervener and the state that it is a contract of hiring a plant, for the sale of material and the furnishing to the journal company of the help necessary to carry out its contracts with the state.

3. Does the evidence disclose such a condition of affairs and such circumstances surrounding the making of the contract between the journal company and the Dakota company, the doing of the work, and the relations of the parties, as to sustain the claim of appellant that such contract is only a device intended to conceal the fact claimed by appellant that the Dakota company is the party really doing the work, and that it is being done in violation of the statute referred to? We shall consider the additional facts claimed to bear upon this question largely as stated in the brief of appellant. It appears that in the spring of 1912, which was before the contract between the state and the journal company had been entered into, or taken effect, the journal company had a contract for the printing of a pamphlet known as the "publicity pamphlet" for the state, and hired it done by the Farnum Printing Company, of Minneapolis, and that this job was done in Minneapolis, Minnesota. We do not recall that it is disclosed in the record how the journal company happened to have this printing, but that is immaterial. The testimony shows that it was a very large job, one pamphlet being required to be sent to each elector in the state, that the time for the execution of the work was very limited, and, it is claimed, that no plant in the state was able to do the work in time so the pamphlet could be distributed when necessary. This is given as the reason why it was

done in Minneapolis, and it of course also appears that at that time the plant of the Dakota company in Bismarck had not been constructed or equipped. Bloom, the journal manager, secured the printing through negotiations with one Dummer, a traveling representative of the Farnum Printing Company. Bloom testifies that he did not then know who the officers of the Farnum Printing Company were. We need not consider whether this contract, or the doing of this work, was legal or not; and we assume that the reason why it is referred to is because, through it, Bloom undoubtedly got into touch and formed an acquaintanceship with the officers of the Farnum Printing Company, and that, when organized, the Dakota company stockholders were either officers or relatives or employees of the Farnum Printing Company, aside from Mr. Bloom. It seems to be the contention of appellant that this fact casts suspicion upon their relations, and tends to show that the Farnum Printing Company is really the Dakota company and a Minnesota concern, rather than a North Dakota concern. It suffices to say that, so far as appears, both are corporations, and persons may be stockholders in two or more corporations without justifying the conclusion that the corporations are one, particularly where they are organized and conduct their business in different states. We do not discern any necessarily impeaching or suspicious circumstance in connection with these facts. It is claimed by appellant that the evidence discloses that the Dakota company was to receive 10 per cent profit on the cost of material and labor used in the state printing, and that the testimony of Bloom shows that he only figured on 10 per cent profit on the state work, and that this, in connection with the fact that he was to pay the additional sum of $250 per month, shows that if the journal company was the real party contracting with the state, or interested in it, it would be an unprofitable job on its face. The record on this is not quite clear, but we think it fairly warrants the conclusion that the journal company figured on a 10 per cent profit over and above what the total cost might be for securing the work done. This disposes of that point.

The next point is that the $7,000 payment made by the state to the journal company for printing between the 1st of January, 1913, and the trial of this proceeding, was turned over *in toto* to the Dakota company. This is fully and reasonably explained by Bloom. His expla-

nation is to the effect that while tabulations were kept of all the labor and material furnished by the Dakota company to the journal company in the execution of its contract with the state, and while strictly in accordance with the terms of the contract they should have, at stated periods, adjusted their financial affairs, that during the sixty days' session of the legislature, which session had not expired when this trial occurred, the plant and the men were worked to the limit, and that the adjustment or stating of accounts and settlements which should have taken place in the interim were deferred until the work was less pressing, and the parties had more time and a better opportunity to strike a balance, and that as the work done at the time of the receipt of the payment on the estimate amounting to $7,000 amounted to a greater sum than that, the entire payment was turned over to the Dakota company to apply on account, leaving settlement to be made in full at a later date. The fact that the printing thus far done was delivered to Bloom as a representative of the journal company, and by him turned over to the Dakota company *in toto,* is without material significance, particularly when we consider that, except as to an insignificant amount, all belonged in the first and second classes, which are not involved in this proceeding. It is shown that the Dakota company was actually engaged in doing work for other parties; that at the time of the trial it had done something like $5,000 worth of such work. Much emphasis is placed upon the fact that the negotiations between Bloom and the other incorporators of the Dakota company for the formation of such a corporation commenced very soon after the letting of the contract between the state and the journal company referred to. This does not strike us as casting suspicion upon the conduct of the parties, or indicating that they intended to evade the law. It is conceded that the journal company did not possess a plant in Bismarck, and that some arrangement had to be made whereby the first and second class work could be done in Bismarck, and their negotiations resulted in a feasible and practical method of securing the use of a plant and material with which to comply with the terms of the contract; and it was incumbent upon the journal company to make such provision before it became necessary for it to enter upon the execution of the contract, and before the legislature should convene, early in January. Negotiations would naturally take place with people who were in the printing business, or who

knew something about it; and unless Bloom desired to move the journal plant from Devils Lake to Bismarck, such arrangements were, of necessity, made with other parties.

It is again insisted that the plant in Bismarck is being operated and conducted for the benefit of the Dakota company. We cannot agree wholly with this. When parties enter into a contract it is presumed to be contemplated that the benefits will be mutual; otherwise one party or the other would decline to join. We have shown clearly what benefits were anticipated by the respective parties to this contract. The record, we think, shows that the journal company contemplated making at least a 10 per cent profit on the work over and above all expenditures; that the Dakota company contracted for a 10 per cent profit on the labor and material, and that the $250 per month might reimburse them for the use of machinery, type, the furnishing of power, floor space, and building, etc., none of which were covered by the 10 per cent feature. It is also urged that the fact of the payment of $250 per month during the entire period covered by the contract should receive great weight and be construed favorably to appellant. We think what we have said regarding the whole contract and the facts disclosed sufficiently answer this. We are not experts in the value of the use of printing machinery, type, the furnishing of power for presses, and the other machinery; and we cannot say that it is an unreasonable compensation, or even so unreasonable as to impeach the motives of the parties in entering upon such contract, and prove that it was merely a scheme to cover up a violation of law. It would seem that Bloom contemplated doing work under his contract with the state aggregating considerable more than $100,000. The proportions of the different classes are not disclosed. The advantage to the journal company from having an accessible plant during the legislative session may have been, and doubtless was, of great value. Certain it is that without it that company would have been powerless to perform, and, as Bloom testifies, it was up to him to procure a plant.

We think we have covered sufficiently the contentions of appellant as to the facts which he claims shed light upon the nature of the contract and the acts of the parties. We realize that, as to these considerations, the appellant had to rely upon the testimony adduced from hostile witnesses, but this does not relieve him from maintaining the burden of

proof in the case; and when the whole record is considered and due weight given to this fact, we are unable to reach the conclusion that it shows a violation or an evasion of the statute. The contract called for the furnishing of material and labor, and a plant, to the journal company, with which it might do the work contemplated by its contracts with the state. The evidence neither proves that the work was being done otherwise than under the terms of the contracts, or in disregard of their terms, or by the Dakota company. In a sense, of course, all hired work is done by the party hired, but the principal is the responsible party. We have not assumed to cover, in this opinion, all of the evidence submitted. We cannot do so. We have only referred to the most salient points and the most important specific contentions of the appellant, which he claims tend to impeach the acts of the journal company. While we might possibly infer that the parties contemplated that a portion, at least, of the third and fourth class printing is to be done at the plant in Bismarck, yet the positive testimony of Bloom is that the greater portion of it will be done in Devils Lake. The only circumstance indicating that the remaining portion may be done in Bismarck is the fact of this contract with the Dakota company and the improbability of its being given to other parties, and any conclusion that it is to be done here is purely a conclusion resting upon inference.

We may add, as a final consideration, that appellant in his argument, in effect, concedes that if the transaction between the journal company and the Dakota Company was in fact a lease it was lawful. We are unable to see what object the manager of the journal company might have in evading the law, or in turning the work over to the Dakota company to do, if he could hire the plant. Bloom, the manager of the journal company, owned only a one-thirtieth interest in the Dakota company, while he owned a controlling interest in the journal company. It follows that his profits to be realized from the work to be done by the Dakota company would be small as compared with like profits if done by the journal company. In view of the conditions, why should he not adopt the legal, rather than the illegal, method of accomplishing the end he had in view? Why should the court discredit respondents' theory and adopt appellant's view of the relation between these printing concerns, when all presumptions are in favor of legal, rather than illegal, transactions? And even if the proof was suscep-

tible of a construction which would render the transaction legal, or of the other, rendering it illegal, it would be the duty of the court, in case of grave doubt, to adopt the former.

We decide, without considering other questions which, by reason of our conclusion, become immaterial, that the judgment of the District Court must be affirmed.