Fannie E. ABBELL, Samuel Abbell, Paul A. Rosenblum, and American National Bank & Trust Company of Chicago, Executors of the Last Will of Maxwell Abbell, deceased, and Joseph J. Abbell,

v.

UNITED STATES.

No. 396–54.

United States Court of Claims.

Oct. 8, 1958.

William P. Rosenthal, Chicago, Ill., for plaintiffs. Rosenthal & Schanfield, Chicago, Ill., were on the briefs.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant. Lawrence W. Sperling, Alexandria, Va., was on the brief.

FAHY, Circuit Judge (sitting by designation).

This is an action against the United States for damages for alleged breach of a lease agreement entered into between plaintiffs and the United States through the General Services Administration. The factual situation may be summarized as follows. In 1952 the United States Government, acting through the General Services Administration, advertised for bids for the lease of property in New York City. Among those received was one from the plaintiffs offering the Paramount Hotel Building, then being used as a hotel, on an "as is" basis. The defendant could not lease the building "as is" because of appropriation problems that made it impossible for the Government to defray the cost of alterations necessary to convert the building to the use desired. In a note appended to their bid, however, plaintiffs stated that they were willing to negotiate a lease containing a provision for plaintiffs at their expense to make the changes required.

The bids were opened in October 1952. Thereafter representatives of the plaintiffs and of the defendant engaged in negotiations which culminated in the execution in September 1953 of an agreement denominated a "lease." This instrument provided that "the Lessor hereby leases to the Government" a major portion of the Paramount Hotel, occupancy to be for five years, with two options for renewals of five years each, "following completion of repairs and alterations and renovations as itemized in Paragraphs 17 and 20." These paragraphs read in pertinent part:

"17(a) * * * Preliminary floor plans and specifications will be furnished by the Government. Upon Lessor's receipt of the preliminary plans and specifications and executed copy of this lease, the Lessor shall immediately employ, subject to approval of the Government, an architect * * *, to prepare the necessary detailed plans and specifications for the remodeling of the premises as required by the Government and obtain all required permits for the remodeling and certificate of occupancy as an office building * * *. Before Lessor proceeds with the work of remodeling the premises, the architect's detailed plans and specifications shall be submitted to the Government for review and final approval.

"17(b) All costs, obligations or expenses (hereinafter called 'construction costs') which are attributable to proper prosecution of the remodeling referred to in Paragraph 17(a) hereof (regardless of whether or not such 'construction costs' are pursuant to a written contract) shall be paid by the Government to the Lessors as herein provided. By way of illustration, such 'construction costs' shall include specifically but not exclusively, labor, material, insurance premiums, permits, taxes, * * * contractors' and sub-contractors' overhead and profits, architectural and engineering fees, inter-

est upon monies borrowed to finance the cost of the alterations and renovations required under Paragraph 17(a) above, and all other of the alterations and renovations * * *. Prior to incurring any 'construction costs', exclusive of architect's fee, and after receipt of the architectural plans and specifications, Lessor shall * * * obtain from a minimum of four bidders a total bid on all the work to be accomplished under the architectural plans and specifications, with the Government reserving the right to name at least two of the bidders * * *. Upon receipt of the bids * * * Lessor shall submit same to the Government for approval * * *. If it shall appear that the 'construction costs' will exceed Six Hundred Thousand Dollars ($600,000), then the Government, by mutual agreement with the Lessor, may modify all or such part of the plans and specifications as shall be necessary or desirable to reduce the total 'construction costs'; provided, however, that nothing contained herein shall be construed to limit the total 'construction costs' to Six Hundred Thousand Dollars ($600,000) if the Government, in the manner provided herein, does not elect to limit such costs to Six Hundred Thousand Dollars ($600,000), in which event, any such increase shall be made only with the consent of the Lessor, which consent shall not be unreasonably withheld * * *.

* * * * * *

"17(d) At such time as the 'construction costs' are ascertained and the building is ready for occupancy, * * * this lease shall be modified by Supplemental Agreement No. 1 in the form attached hereto as 'Exhibit A', which agreement shall provide for payment of the 'construction costs' to the Lessor in one hundred and twenty (120) equal monthly installments * * *.

"17(e) In the event this lease shall be terminated for any reason whatsoever at any time during the term of this lease or any renewal thereof, the Government's obligation to repay the 'construction costs' shall not be modified, diminished, or in any other way altered or affected.

* * * * * *

"20. During the continuance of this lease and at no expense to the Government the Lessor shall * * * comply with all applicable municipal ordinances, regulations and statutes relating to buildings and their equipment, and to make or have made such changes as may be required to bring such structure or equipment into conformity with existing codes * * *."

In addition paragraph 14 is material:

"14. In performing any work herein required to be done by Lessor, the Lessor agrees to comply with all applicable State, Municipal and Local Laws and the rules, regulations and requirements of any departments and bureaus and all local ordinances and regulations."

In accordance with paragraph 17(a), the defendant furnished preliminary floor plans and specifications. Plaintiffs employed architects who prepared the detailed plans and specifications. These, however, contained three items not included in the preliminary plans prepared by the defendant, namely, a truck bay and fire alarm and sprinkler systems, required by New York City zoning ordinances. The truck bay called for extensive and expensive renovation to the superstructure of the building. In all the cost of the renovation as detailed in the architects' plans would push the cost far above the $600,000 figure. The Government refused to approve the inclusion of the truck bay, fire alarm, and sprinkler items in the detailed plans. A controversy ensued as to who had the responsibility for these costly items. Plaintiffs contend that as these items were necessary to the use of the building for office purposes the defendant must

bear their cost as part of "construction costs"; the defendant contends that the September 1953 agreement contemplated that the defendant pay only for those changes it requested and that the plaintiffs, under paragraphs 14 and 20, were to pay for changes required by city ordinances but not requested for defendant's use.

This controversy was unresolved by the parties and demonstrates the difficulty we find with the plaintiffs' position. Their position is that the September 1953 agreement was a completed, legally operative lease which called for performance by defendant, failing in which they are entitled to damages for its breach. Yet there were the above-mentioned items of major importance unsettled by the agreement of September 1953. While it is true that in November 1952 defendant had furnished to plaintiffs an outline description of the alterations it would require, until these could be embodied in specific plans it could not be known what alterations were actually to be made and paid for by defendant. Neither party had investigated zoning requirements, which intervened to lift the costs very substantially. To the extent agreement had been reached it contemplated a cost ceiling far less than was possible under the architect's detailed plans and specifications, which were never approved.

To find defendant responsible for breach of agreement in refusing to go forward when so much remained unsettled would require the court itself to write a major portion of the agreement. This it should not do. See Fremon v. W. A. Sheaffer Pen Co., 8 Cir., 209 F.2d 627; National Bank of Kentucky v. Louisville Trust Co., 6 Cir., 67 F.2d 97, 102; Bonk v. Boyajian, 128 Cal.App.2d 153, 155, 274 P.2d 948; 1 Williston, Contracts § 45 (3d ed. 1957). Though denominated a lease, with words of demise,[1] the September 1953 agreement, in the situation we have explained, was not

a final, enforceable lease or other agreement evidencing a meeting of the minds of the parties. Kerr Glass Mfg. Corp. v. Elizabeth Arden Sales Corp., 61 Cal. App.2d 55, 141 P.2d 938; See Mid-Continent Petroleum Corp. v. Russell, 10 Cir., 173 F.2d 620; American Merchant Marine Ins. Co. v. Letton, 2 Cir., 9 F.2d 799.

Plaintiffs contend that defendant's failure to approve the plans drawn by the architects or to propose modifications that would lower the costs to its satisfaction constituted breach of contract, relying upon Stevens v. Howard D. Johnson Co., 4 Cir., 181 F.2d 390. But here the parties neither had arrived at a final agreement as to the alterations to be made nor upon terms under which the law fixed responsibility upon defendant to prevent damages to plaintiff due to the failure of the parties to resolve the disagreement which arose. Moreover, defendant did make a proposal for modifying the alterations so as to bring the costs down to $600,000. This was rejected by plaintiffs. In addition, it is not simply that the parties were unable to agree as to who was obligated to pay for the truck bay and fire alarm and sprinkler systems, but we find no legal basis for holding that such an obligation had been placed by contract upon defendant. For defendant to refuse to go forward when the situation as it developed left so much unresolved by the negotiations was not so unreasonable as to constitute a breach of agreement on its part.

We have considered plaintiffs' contention that they are entitled to recover on the theory that the United States through its representatives anticipatorily breached the lease on the ground that it was illegal and ultra vires in certain of its provisions, thus relieving plaintiffs of responsibility for further performance and entitling them to sue for breach of agreement. They cite Roehm v. Horst, 178 U.S. 1, 20 S.Ct. 780, 44 L.Ed.

[1]. These are not conclusive. See State v. McCombs, 156 Kan. 391, 133 P.2d 134; Whiteside v. Oasis Club, 162 Mo.App.

502, 142 S.W. 752; State v. Hall, 25 N.D. 85, 141 N.W. 124.

953, and In re Mullings Clothing Co., 2 Cir., 238 F. 58, as well as other cases. We do not think this contention furnishes a basis for a decision favorable to plaintiffs; for though it be true that the representatives of the United States did at a certain point characterize provisions of the lease as illegal and ultra vires—a position not persisted in during the litigation—it is also true that the negotiations between the parties actually collapsed for other reasons and in the manner we have described.

 Since there was no breach by defendant of an enforceable agreement plaintiffs must bear the costs which they expended in the process of trying to reach such an agreement. Defendant was also at considerable expense which it has not sought to recover.

The petition will be dismissed.

It is so ordered.

REED, Justice (Retired), sitting by designation, JONES, Chief Judge, and LARAMORE and MADDEN, Judges, concur.