(70 Misc. Rep. 308.)

LONG v. JOHNSON et al., Commission on New Prisons.

(Supreme Court, Special Term, Ulster County. December, 1910.)

1. CONSTITUTIONAL LAW (§ 68*)—JUDICIAL FUNCTIONS.

The legislative and executive departments are responsible for the fiscal policies of the state and carrying them out, and the courts will not interfere therewith.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 68.*]

2. STATES (§ 168½*)—ACTION BY TAXPAYER—INJUNCTION—AUTHORITY.

In the absence of statute, a taxpayer, having no rights aside from those possessed by taxpayers as a whole, may not sue to restrain a state commission appointed by the Governor to construct a prison plant, though the commission has not been economical, has shown favoritism, and has made errors in judgment in adopting plans and advertising for bids.

[Ed. Note.—For other cases, see States, Dec. Dig. § 168½.*]

3. STATES (§ 168½*)—ACTION BY TAXPAYER—INJUNCTION—AUTHORITY.

Code Civ. Proc. § 1925, and General Municipal Law (Consol. Laws, c. 24) § 51, authorizing an action by a taxpayer to prevent waste of the property of a county, town, city, or village, etc., merely authorizes a tax-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

payer to obtain relief in equity against officers of a county, town, city, or village, and a board of state officers may not be enjoined at the suit of an individual taxpayer, having no rights aside from those possessed by taxpayers as a whole.

[Ed. Note.—For other cases, see States, Dec. Dig. § 168½.*]

Action by Ellis B. Long against Elisha M. Johnson and others, constituting the Commission on New Prisons of the State of New York. Temporary injunction vacated.

Augustus H. Van Buren, for plaintiff.

Edward R. O'Malley, Atty. Gen. (Howard Chipp, of counsel), for defendants.

BETTS, J.   This is an action commenced by Mr. Long, a resident and taxpayer of the county of Ulster, against the defendants, asking an injunction to restrain the defendants from awarding any contract for the construction of a new state prison under the plans and specifications adopted by them, and under which bids had been advertised for, and that it shall be determined in this action whether the same be for the best interest of the state, and that said commissioners be during the pendency of the action restrained and enjoined from awarding any contract.   Upon the complaint and affidavit of plaintiff, which sets forth substantially the same facts as the complaint, a preliminary injunction was issued on December 14th, returnable at a Special Term held on December 17th, when the plaintiff asked that the injunction should be continued during the pendency of the action, and the defendants asked that the same should be vacated.

It appeared on the hearing and by the statutes that by chapter 670 of the Laws of 1906 the Governor was authorized to appoint a commission of not less than three nor more than five persons, whose duty it should be to select a suitable site for a new state prison; the design of the statute being to provide for a new state prison in place of the one at Sing Sing or Ossining.   By chapter 521 of the Laws of 1907 the act was amended, among other things, by giving to said commission in substance authority to erect a state prison, that the cost should not aggregate more than $2,000,000, and that the said state prison plant should be capable of housing not less than 1,400 prisoners.   By chapter 208 of the Laws of 1908 the act was further amended by appropriating $125,000 for commencing the work of constructing such new prison, and for the erection of temporary barracks, barns, shops, and a stockade, etc.   By chapter 214 of the Laws of 1908 the act was further amended in regard to the erection of such prison.   Chapter 447 of the Laws of 1909 further amended said act by making a preliminary appropriation of $150,000 for preliminary work, and the commission was authorized to expend the "sum of two million two hundred thousand dollars ($2,200,000) for the buildings and for the heat, light and power equipment, not including the grading and other preliminary work or the cost of the site or architectural supervision or for so much of said plant as can be constructed for such sum."   The contract shall provide that the state shall not be liable for any failure on the part of

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the Legislature to appropriate sufficient money for the completion of the contract within the terms thereof, and $500,000 was appropriated towards the erection of said prison.

The first prison site selected having later been appropriated by the Palisades Park, chapter 365 of the Laws of 1910 authorized the commission on new prisons to select a new site upon which to establish a new state prison and to construct such new prison to take the place of Sing Sing on such new site, and the commission was authorized to use so much of the $500,000 appropriated by the statute of 1909 as may be necessary for the purchase of such new site, and the balance of said sum was reappropriated and made available for the construction of such prison plant. Under this statute five commissioners were appointed, of which only two, Cornelius V. Collins, the superintendent of prisons, and Elisha M. Johnson, the president of said commission, of the original appointees, are now members of it. In place of others dying or resigning, three of the present commissioners were appointed by Governor Hughes, and Cornelius V. Collins was continued as superintendent of prisons by Governor Hughes during his term of office.

The action of the commission in advertising for bids for the erection of said prison is attacked by the plaintiff upon the grounds that said plans and specifications are so made and drawn as to prevent free competition among parties desiring to bid for the erection of said prison, in that they specify and provide that the stone to be used in the construction of said prison shall be of a certain kind, which only is known to exist in one locality in the state of New York, by reason of which it would give the owner or owners of such stone the exclusive right to have awarded to him or them the contract for building said prison, whereas stone equally as serviceable for the building of said prison exists in many localities in the state of New York, and that the plans and specifications as drawn are so drawn that, if the contract be awarded under the same, the cost of constructing said prison would be a sum far in excess of what it would cost if said plans and specifications were so drawn as to permit free competition among bidders and the use of other materials than those specified in said plans and specifications were permitted, and that if a contract be awarded by said commission pursuant to said plans and specifications the people of this state, and plaintiff as a taxpayer of the same, will be put to useless, unnecessary, and exorbitant cost and expense, all greatly to the damage of every taxpayer of the state, and particularly to this plaintiff; and plaintiff's affidavit accompanying the same is practically to the same effect as the complaint.

Upon the hearing the commission appeared by a Deputy Attorney General and urged that the injunction be vacated and the letting of the contract and the construction of the prison be permitted, and it further appeared on the hearing that one bidder, the P. J. Carlin Construction Company had made a bid which was less than the sum of $2,200,000 by $4,000, and said bid omitted the construction of certain buildings provided for by the plans and specifications, which omission was permitted by the plans and specifications and advertisement, as is

asserted by the defendant's attorney. A verified history of the various proceedings under the statutes, given by the secretary of this commission on new prisons, by the president thereof, by the state architect, and by the architect of the commission on new prisons, and by Patrick J. Carlin, president of the construction company, was submitted by the Deputy Attorney General.

It seems from such affidavits that the design first was to have the prison located where a sufficient quantity of trap or other rock suitable for use in building the new prison could be had, and where the inmates of the present state prison might work upon the same. Later on that provision seems to have been lost sight of. The first plans and specifications in substance provided for the building of the exterior walls of plain red brick, with the corners or ornamental facings of Indiana limestone. This did not meet the approval of Franklin B. Ware, the state architect, and he suggested the advisability of changing the exterior finish of the buildings, that would be conspicuous from the Hudson river, from common brick to cut stone, which might be gotten in the locality. "The commission investigated the advisability of using local cut stone, and determined that its use would be impracticable." Later, and on February 17, 1909, the commission adopted a resolution which provided for a change of plans, to the effect "that the exterior surface of the walls of the buildings, from its foundations to and including the water tables, be of Potsdam stone or its equal," and that the exterior surface of the walls be of light pressed brick, with Potsdam stone trimmings, or its equal, wherever stone trimmings are specified in said plans. The state architect was asked to approve these plans, and would not approve them until an appropriation for the additional amount of such change was made by the Legislature. The commission made estimates as to what additional cost this change of plan would entail, and such estimate came to the sum of $200,000. Thereupon the commission reported that fact to the Legislature, and the Legislature, by chapter 447 of the Laws of 1909, hereinbefore referred to, added $200,000 to the amount of the original total expense contemplated by the Legislature and the commission. Such appropriation was approved by the Governor, and in May, 1909, the state architect approved such change in the plans by the following certificate:

"I approve the proposed changes, which contemplate the facing of all buildings with a light pressed brick; that the stone trimmings be of Potsdam sandstone or equal; the warden's residence and recreation building to be entirely faced with stone ashlar as above."

In this connection it may be noted that the warden's residence and recreation building and other buildings were not provided for in the bid submitted by Mr. Carlin.

Mr. Beardsley, the architect, was thereupon directed to prepare specifications in accordance with this change of plan, which he did, and the commission finally found a new site for the new prison and advertised for bids. The bids had been opened just prior to the service of the injunction upon the commission, by which it was found that there were five bids reported, showing the amount of the "net bid," as it is called—that is, the bid with certain buildings omitted there-

from, or their construction not required—ranging from $3,196,000 to $3,608,700.

The secretary of such commission in his affidavit says that the plans and specifications do not and did not prevent free competition between the parties desiring to bid for the erection of the prison, and it is claimed by him that the same paragraph as to the kind of stone to be used here was adopted in the construction of the new educational building at Albany.

The state architect says that the use of the phrase "Potsdam stone or equal," as contained in the specifications, does not forbid nor debar the use or consideration in the construction of the building of other stone, and that this phrase merely suggested the type and color of stone which was thought desirable for constructive and artistic effect, and was therefore adopted to be used as a standard, and that the use of the term "or equal" establishes the principle that a substitute may be offered for the standard mentioned.

Mr. Beardsley says, among other things, that the plans and specifications were placed on file in the office of the commission on new prisons at the Capitol, Albany, and at his office at Poughkeepsie, and upon the site of the new prison, at the temporary office of the architect. He also says that the cost of the Potsdam sandstone necessary for the completion of this contract is about the sum of $178,537, and that there are various quarries of Potsdam sandstone in several localities in the state of New York; "that these localities and quarries are not in the control of any one person or individual, and therefore no person or individual has any exclusive possession of such stone, nor could he acquire any exclusive right to have awarded to him the contract for building said prison because of his ownership of any quarry or such stone;" that copies of the plans and specifications were supplied to 46 individuals; and that he was engaged for about a year and a half in drawing general plans and specifications for the erection and completion of the state prison.

Patrick J. Carlin, the president of the P. J. Carlin Construction Company, the lowest bidder, says that he received bids for three different kinds of stone, any of which, in his judgment would fulfill the specifications. The proposed plans and specifications are submitted, and they consist of a volume of 196 pages, closely printed, aside from the index.

It appears from the matter submitted in reply here by the representatives of the commission on new prisons that a substantial change in the plans was made, by which the increased cost, so far as covered by this contract, was about $179,000, as sworn to by Mr. Beardsley, the architect. This was solely in an attempt to adorn and beautify the exterior of the building. Nearly the sum of $200,000 is to be expended by direction of the commission and with the sanction of the Legislature in seeking after the unattainable. A prison, known to be such, is hideous and ugly. It can be viewed by two classes of people only; i. e., the inmates and those who are not. The inmates are not proud of their environments, however ornate, and no amount of embellishments can make it attractive to outsiders. Economy in con-

struction, if it occurred to any person connected with the new state prison, found no expression on the hearing of this motion. Indeed, any changes made or suggested, so far as shown, were to make the buildings more expensive.

The amounts authorized to be expended under these progressive statutes are instructive. By an examination of section 9 of chapter 521 of the Laws of 1907 it appears that that statute authorized the construction of a new state's prison plant, which was not to cost in the aggregate more than $2,000,000. By an examination of section 14 of chapter 447 of the Laws of 1909, under which the commission advertised for bids and is now proceeding, it will be seen that the commission was authorized to enter into a contract "at a total cost of not exceeding the sum of two million two hundred thousand dollars ($2,200,000) for the buildings and for the heat, light and power equipment, * * * or for so much of said plant as can be constructed for such sum."

It will thus be seen that it is not at all a completed prison plant that the commission has provided for, or that the bid proposes; that several buildings of importance are omitted therefrom, and the state is apparently committed to the expenditure of many hundred thousand dollars for this new prison plant in excess of the $2,200,000 stated in the above act. In other words, the Legislature and Governor Hughes authorized and permitted this commission to expend $2,200,000 for a partially completed prison plant, for a beginning only, and they are proceeding so to do. This permissive statute also was passed in 1909, when the strain of increased expenditures was shown to be growing more and more out of proportion to the returns from indirect taxation. However, Legislatures and executives, and not the courts, are responsible for fiscal policies and actions.

It is urged on behalf of the defendants that this plaintiff has no standing in court to maintain this action, because he is simply an individual taxpayer, and has no rights aside from those possessed by taxpayers as a whole, and that it is not the law that an individual taxpayer may stop a state commission, consisting of state officers appointed by the Governor to construct a prison plant, even if the commission has not been economical, has shown favoritism, or has made an error in judgment or otherwise in adopting plans and specifications and advertising for bids. It is stated by Blackstone (book 4, p. 167) that:

"It would be unreasonable to multiply suits, by giving every man a separate right of action, for what damnifies him in common only with the rest of his fellow subjects."

It was held in Mooers v. Smedley and Others (in 1822, an action in chancery) 6 Johns. Ch. 28–30, by the Chancellor:

"I cannot find, by any statute, or precedent, or practice, that it belongs to the jurisdiction of chancery, as a court of equity, to review or control the determination of the supervisors, in their examination and allowance of accounts as chargeable against their county, or any of its towns, and in causing the moneys so allowed to be raised and levied."

And he held that, if any remedy could be had, it must be in an action at law and not an action in equity.

In Doolittle v. Supervisors of Broome County (1858) 18 N. Y. 153–161, the court held in an action by several persons, 17 in number, residents and freeholders of the town of Chenango, that they had no such standing in court as would permit the court to restrain the operation of the board of supervisors from making changes in towns or town lines. The court says:

"The general rule certainly is that for wrongs against the public, whether actually committed or only apprehended, the remedy, whether civil or criminal, is by a prosecution instituted by the state in its political character, or by some officer authorized by law to act in its behalf. For example, criminal offenses of every grade, as is well known, are punishable only by prosecution at the suit of the people."

And on page 163 the court says:

"If the grievance consists in an alleged illegal exercise of official functions, those who question them, if they would have a preventative remedy, must invoke the action of the officer whom the law has appointed to sue in such cases. No private person or number of persons can assume to be the champions of the community, and in its behalf challenge the public officers to meet them in the courts of justice to defend their official acts."

In Roosevelt v. Draper et al. (1861) 23 N. Y. 318–323, an action was brought by plaintiff, claiming to be a resident citizen, and a person liable to be taxed, to restrain the corporate action of the city of New York, and the court said:

"As a resident citizen, and a person liable to be taxed, he has no other rights than such as are common to all the people of that community who own property; and we have decided upon full consideration that it requires some individual interest, distinct from that which belongs to every inhabitant of the town or county, to give the party complaining a standing in court, where it is an alleged delinquency in the administration of public affairs which is called in question. * * * The fact of owning taxable property is not such a peculiarity as to take the case out of the rule. * * *"

In People v. Fields, 58 N. Y. 491, begun before 1872, decided in 1874, it is held that:

"An individual taxpayer, or a number of taxpayers, may not maintain such an action." * * * They do not represent, and may not assume to act, for the whole public body injuriously affected."

Then came the statute of 1872 (chapter 161), which first provided for an action by a taxpayer, and it has been continued down to the present time, and its provisions are now in substance contained in section 51 of the general municipal law (Consol. Laws, c. 24) and section 1925 of the Code of Civil Procedure. The first decision under that statute of 1872 is Ayers et al. v. Lawrence et al., 59 N. Y. 192–195, decided in 1874, and the court holds:

"By the rules of law, as established by the courts, the taxpayers were entirely without remedy, no matter how gross the fraud or wanton the robbery, and notwithstanding the officers of the corporation, those whom the law had put in authority to watch over and protect their constituents and guard their interests, were faithless to their duty or confederate with the wrongdoers."

And it is said that this utter helplessness of the taxpayer led to the passage of the statute known as the "Taypayers' Act of 1872," and it was there held that such an action could not be maintained prior to the passage of that statute.

And in Osterhoudt v. Rigney et al., an action arising in this county, in 1885, at 98 N. Y. 222–229, it was held that:

"It was the settled law, prior to the enactment of chapter 161 of the Laws of 1872, that the review and correction of errors, mistakes, or abuses, in the exercise of the powers of inferior and subordinate jurisdictions, and the official acts of public officers, in the absence of fraud or corruption, was exclusively of legal cognizance, of which courts of equity had no jurisdiction."

To the same effect are Matter of Light, 21 Misc. Rep. 737, 49 N. Y. Supp. 345, and Queens County Water Co. v. Monroe, 83 App. Div. 105, 82 N. Y. Supp. 610, so that we see that the only authority for a taxpayer to obtain relief in equity must be obtained under the section of the Code (1925) which is directed against officers of a county, town, city, or incorporated village of the state, and not against the state or a state officer, and also section 51 of the general municipal law, which provides for actions by taxpayers under certain circumstances as against a county, town, village, or municipal corporation's officials.

These two statutes are substantially a continuation or amendment of the original taxpayers' statute of 1872, and cannot be successfully invoked in this action, because they do not apply to state officials or boards or commissions. From these statutes and decisions, it would seem clear that a board of state officers cannot now be enjoined at the suit of an individual taxpayer, who has no special rights nor grievances aside from the great mass of taxpayers, by a court of equity.

It is true that the doctrine that redress of alleged public wrongs must be sought only through the state or its law officers, and not by an individual, receives, as suggested by the attorney for the plaintiff here, a somewhat severe jolt, when, as in this case, actual or proposed wrongdoing is alleged against a state commission, and the Attorney General appears in the defense of the officials attacked, nevertheless courts must proceed according to the existing statutes and decisions, and new remedies, if desirable, must be furnished by the Legislature.

It may be, as claimed, that economy of construction has been neglected or favoritism shown by this commission, that more alacrity has been shown since November 8th than was being displayed during the 18 months that this architect was drawing these plans, that the distressed and crowded condition of the convicts at Sing Sing is more apparent and the need for the speedy construction of a new prison for their amelioration is greater now than it was two months ago, but, if so, it presents questions, so far as this case is concerned, that call for legislative rather than judicial investigation.

The learned Attorney General was at pains to inform the court on the hearing herein that the power of the architect under the contract as to substitution of stone was not greater than the commission that employed him. I assume that the powers of the commission are not greater than, but are held subordinate to, the Legislature that authorized its creation. Indeed, it is so recognized in the proposed contract, as we have seen, by providing, in substance, that the state shall not be liable for any failure on the part of the Legislature to ap-

propriate sufficient money for the completion of the contract within the terms thereof.

I asked the plaintiff's attorney to submit authorities showing any right in plaintiff to maintain this injunction pendente lite, and none were submitted. Permission was asked, and not refused, to file further affidavits. None have been filed, but affidavits could not strengthen the complaint.

The responsibility of the contract, and the risk, if there be any, devolves on the commission, and I think this plaintiff has no standing here in this action to ask for the continuance of this temporary injunction during the pendency of the action, and an order may be handed up vacating it.