[No. 3101. August 16, 1926.]

ASPLUND v. HANNETT et al.

[249 Pac. 1074.]

SYLLABUS BY THE COURT

1. Neither the Enabling Act, § 10, nor the Constitution, article 21, § 9, gives citizen right to sue to enjoin misapplication of proceeds of land grants.

2. Code 1915, § 4079, does not authorize causes of action or enlarge jurisdiction.

3. Unconstitutionality of a statute is not in itself a cause of action nor a head of equity jurisdiction.

4. A taxpayer's interest is not sufficient to invoke the aid of equity to enjoin state officers from making illegal expenditure of state funds.

5. A citizen and taxpayer has no standing to enjoin the Governor and other state officers from making expenditures from the "permanent reservoirs for irrigating purposes, income fund," on the ground that the statute authorizing such expenditures is violative of the trust condi-

[1] 36Cyc p. 900 n. 28 New.    [2] 12CJ p. 784 n. 34; p. 883 n. 92; 30Cyc p. 133 n. 88, 92.    [3] 12CJ p. 760 n. 57; p. 764 n. 78.    [4] 32CJ p. 51 n. 96; p. 57 n. 34; 36Cyc p. 900 n. 28 New.    [5] 36Cyc p. 900 n. 28 New.    [6] 3CJ p. 763 n. 71; p. 786 n. 76; 31Cyc p. 102 n. 4.

tions under which the state holds the fund, and hence violative of the constitutional provision accepting the conditions of the trust.

6. The failure of the complaint to show any interest in the plaintiff entitling him to relief is a failure to state facts sufficient to constitute a cause of action, a jurisdictional question which may be raised at any time.

Appeal from District Court, Santa Fe County; Holloman, Judge.

Suit by Rupert F. Asplund, a citizen and resident taxpayer, on behalf of himself and all other citizens and resident taxpayers, against A. T. Hannett and others, state officers, for an injunction. From a judgment dismissing the complaint, plaintiff appeals. After an order of reversal and pending a rehearing, the Attorney General, on behalf of the State, moved to dismiss the appeal. Motion sustained, and former opinion withdrawn.

George W. Prichard and Charles B. Parker, both of Santa Fe, and George S. Downer, of Albuquerque, for appellant.

Fred E. Wilson, Atty. Gen., James N. Bujac, Asst. Atty. Gen., and J. O. Seth and Sam G. Bratton, both of Santa Fe, for appellees.

OPINION OF THE COURT

WATSON, J. By the act of June 21, 1898, known as the Ferguson Act [30 Stat. 484], Congress made numerous grants of land for various purposes to the territory of New Mexico. Some of these were of specific lands, and others were of lands to be selected. Among these grants was one of 500,000 acres to be selected "for the establishment of permanent water reservoirs for irrigating purposes." As to the lands in question, it was provided that the same might be selected and sold under certain named restrictions, and that:

"All money received on account of such sales, after deducting the actual expenses necessarily incurred in connection with the execution thereof, shall be placed to the cred't of separate funds created for the respective purposes named in this act, and shall be used only as the

legislative assembly of said territory may direct, and only for the use of the institutions or purposes for which the respective grants of land are made." Section 10.

By the Enabling Act (Act of June 20, 1910 [36 Stat. 557]), certain new and supplemental grants were made to the state for named purposes, and the previous grants to the territory were confirmed and expressly transferred to the state. It was therein provided that all of such lands, including previous grants, "shall be by the said state held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same." Section 28. It was further provided that the disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any other or different purpose than that specified, should be deemed a breach of trust; that separate funds should be established for the several objects of the grants; and that moneys in any manner derived from any of the lands should be deposited in the fund corresponding to the grant; that no moneys should be taken from one fund for deposit in any other, or for any object other than that for which the land producing it was granted; that all such moneys should be safely invested; that the Attorney General should institute necessary or appropriate proceedings to enforce the provisions of the trust, but not to the exclusion of the power of the state, or of any citizen thereof, to enforce the same; that the state and its people should consent to all of said provisions by ordinance made, by proper reference, a part of the Constitution and by its terms positively precluding the making, by constitutional amendment, of any change in or abrogation of such ordinance without the consent of Congress.

The Constitution of this state expressly consents to all of the foregoing provisions of the Enabling Act and accepts the several trusts therein created. By subsequent legislation, funds have been established, known

as "permanent reservoirs for irrigating purposes, permanent fund," and "permanent reservoirs for irrigating purposes, income fund."

. By chapter 112, Laws of 1923, authority was given for the appointment of a commissioner to negotiate, on the part of New Mexico, with a commissioner to be appointed by the state of Colorado, a compact determining the rights of the two states "to the use, control and disposition of the waters of the Rio Grande river, and of the streams tributary thereto" (section 1), and providing for the payment of the expense of such negotiations out of the water reservoir for irrigating purposes, income fund.

By chapter 66, Laws of 1925, it was provided that if an agreement could not be reached with Colorado under chapter 112, Laws of 1923, "the Governor of New Mexico is hereby authorized to take such steps, make such investigations and institute or cause to be instituted in the name of the state such legal proceedings as in his judgment may be necessary for the protection of rights to the waters of the Rio Grande within this state." The Governor was authorized to engage the necessary engineers, employees, and attorneys, and to fix their compensations; for which purpose there was appropriated $25,000 from the water reservoirs for irrigation purposes, income fund.

Appellant (plaintiff below), a citizen and resident taxpayer of the state, complaining on behalf of himself and all other citizens and resident taxpayers of the state who might come in and seek the relief prayed for, sued for an injunction to prevent the Governor, the state auditor, and the state treasurer from expending the permanent water reservoirs for irrigating purposes, income fund, in the manner provided in chapter 66, Laws of 1925, claiming that such expenditure would constitute a breach of the trust imposed upon the fund by Congress and accepted by the people of this state by their Constitution. A temporary injunction was issued, but, upon the sustaining of the demurrer of appel-

lees (defendants below), the same was dissolved. Appellant declining to amend his complaint, judgment was entered dismissing it.

On December 21, 1925, we handed down an opinion sustaining appellant's contention that chapter 66, Laws of 1925, and the execution thereof, constituted and would constitute a breach of said trust, and reversed the judgment. On account of the great public importance of the case, however, we granted a rehearing. Pending the rehearing, the Attorney General filed for the state a motion to dismiss the appeal, which motion was argued and submitted in connection with the rehearing granted, and will now be considered. One ground of the motion to dismiss is thus stated:

"Because the complainant in the court below, appellant, here, Rupert F. Asplund, assumes to institute and maintain this action as a citizen, and there is no authority in the laws of the United States or the state of New Mexico by which said Rupert F. Asplund, or any other citizen, may institute or maintain an action of this character."

It does not appear from the complaint that appellant will be affected by the acts sought to be enjoined in any other manner than any other taxpayer of the state. Nor does it appear what effect, if any, the proposed action will have, either to increase or decrease the taxes of the appellant, or of any taxpayer of the state; nor that any personal, property, or civil right of any individual is threatened with injury by the proposed acts, unless it can be said to be an individual right to prevent the violation of the Constitution, and particularly a breach of the public trust arising out of the Ferguson Act, the Enabling Act, and the Constitution, as above set forth. Does this situation call for or warrant the interference of a court of equity at the behest of a citizen taxpayer?

[1] To enforce the provisions of the act relative to the application and disposition of the lands and the proceeds thereof and the funds derived therefrom, it is made the duty of the Attorney General of the United States to prosecute, in the name of the United States

and (in) its courts such proceedings at law or in equity as may from time to time be necessary and appropriate. Enabling Act, § 10. But in the same section it is provided that nothing therein shall be taken as a limitation of the power of the state, or of any citizen thereof, to enforce the provisions of the act. Some question is raised as to the meaning of these provisions, but we think it plain. So far as it established any power, or imposed any duty to enforce the provisions of the act, such power and duty were conferred and imposed upon the Attorney General of the United States. Congress conferred no power, and imposed no duty upon the state or citizen. It simply recognized and consented to the power of the state to control its agencies, and recognized and consented to whatever rights a citizen of the state might have in the premises, under state laws. By Constitution, art. 21, § 9, we consented to "the means and manner of enforcing such terms and conditions:" That is to say, we consented that the Attorney General might enforce the provisions of the act by proceedings in federal courts, but not as a duty or power exclusive of the power of a state or a citizen to enforce them. The constitutional consent is just as broad as the congressional provision, and no broader. Hence, neither in the Enabling Act nor in the Constitution do we locate the power of a citizen and taxpayer to sue for the enforcement of the trust provisions.

[2] To sustain his right as a party plaintiff, appellant points to Code 1915, § 4079, which provides:

"When the question involved in a cause of action is one of common or general interest to many persons, or where the parties are numerous and it is impracticable to bring them all before the court one or more may sue or defend for the benefit of the whole number of persons so interested in said cause of action."

We do not deem this sufficient. That section presupposes the right to sue, merely authorizing one of the persons possessing such right to sue in behalf of himself and others. It does not authorize new causes of action or enlarge jurisdiction.

Having found no constitutional or statutory provi-

sion authorizing taxpayers' suits in such cases, we are compelled to look to the general principles of law as declared by the courts.

On what does appellant base his claim of right to invoke the equitable remedy of injunction? The wrong alleged is the enactment of Laws 1925, c. 66, in violation of the Constitution, and the proposal of the Governor to carry out its provisions. The result is in an illegal misapplication of public moneys. A citizen and taxpayer can have but two interests; his interest in the upholding and enforcement of the Constitution, and his interest to prevent illegal imposition of taxes. There is no warrant for any distinction between the taxpaying and the nontaxpaying citizen as respects his interest in upholding the Constitution generally. As a taxpayer he has an interest in the disposition of the state's property and funds according as his taxes may be affected thereby. So we seem to have two questions: The first, whether a citizen may appeal to the courts to prevent a violation of the Constitution; the second, whether a taxpayer may apply to them to prevent misuses of public funds.

The first question does not, in our judgment, require extended discussion. In our scheme of government, the function of the courts is to declare and apply the law in the decision of justiciable controversies. We are not placed over the other departments of government, generally, to review or interfere with their acts, as the special guardian of the Constitution. Ours is the judicial power. In the exercise of that power—the hearing and determination of causes of action—we necessary enforce the supremacy of the Constitution and disregard all enactments and proceedings violative of it. That is the beginning and the end of the much discussed and misunderstood power of the courts to declare the unconstitutionality of statutes. From many expositions of this doctrine we select two which come readily to hand, and insert them here:

"The supremacy of the law requires that where enacted Constitutions form the fundamental law there be some

authority which can pronounce whether the Legislature itself has or has not transgressed it in the passing of some law, or whether a specific law conflicts with the superior law, the Constitution. If a separate body of men were established to pronounce upon the constitutionality of the law, nothing would be gained. It would be as much the creature of the Constitution as the Legislature, and might err as much as the latter. Quis custodiet custodes? Tribunes or ephori? They are as apt to transgress their powers as other mortals. But there exists a body of men in all well-organized polities, who, in the regular course of business assigned to them, must decide upon clashing interests, and do so exclusively by the force of reason, according to law, without the power of armies, the weight of patronage or imposing pomp, and who, moreover, do not decide upon principles in the abstract, but upon practical cases which involve them—the middle men between the pure philosophers and the pure men of government. These are the judges—courts of law. When laws conflict in actual cases, they must decide which is the superior law and which must yield; and as we have seen that according to our principles every. officer remains answerable for what he officially does, a citizen, believing that the law he enforces is incompatible with the superior law, the Constitution, simply sues the officer before the proper court as having unlawfully aggrieved him in the particular case. The court, bound to do justice to every one, is bound also to decide this case as a simple case of conflicting laws. The court does not decide directly upon the doings of the Legislature. It simply decides, for the case in hand, whether there actually are conflicting laws, and, if so, which is the higher law that demands obedience when both may not be obeyed at the same time. As, however, this decision becomes the leading decision for all future cases of the same import, until, indeed, proper and legitimate authority shall reverse it, the question of constitutionality is virtually decided, and it is decided in a natural, easy, legitimate, and safe manner, according to the principle of the supremacy of the law and the independence of justice. It is one of the most interesting and important evolutions of the government of law, and one of the greatest protections of the citizen. It may well be called a very jewel of Anglican liberty, one of the best fruits of our political civilization." Lieber's Civil Liberty and Self Government, p. 162.

"So, also, there are cases where, after the two houses of the Legislature have passed upon the question, their decision is in a certain sense subject to review by the Governor. If a bill is introduced the constitutionality of which is disputed, the passage of the bill by the two houses must be regarded as the expression of their judgment, that, if approved, it will be a valid law. But if the Constitution confers upon the Governor a veto power, the same question of constitutionality authority will be brought by the bill before him, since it is manifestly his duty to withhold approval from any bill which, in his

Asplund v. Hannett et al., 31 N. M. 641

opinion the Legislature ought not 'for any reason to pass. And what reason so forcible as that the' Constitution confers upon them no authority to enact it? In all these cases and the like cases, each department must act upon its own judgment, and cannot be required to do that which it regards as a violation of the Constitution, on the ground solely that another department which, in the course of the discharge of its own duty, was called upon first to act, has reached the conclusion that it will not be violated by the proposed action. But setting aside now those cases to which we have referred, where from the nature of things, and perhaps from explicit terms of the Constitution, the judgment of the department or officer acting must be final, we shall find the general rule to be, that whenever action is taken which may become the subject of a suit or proceeding in court, any question of constitutional power or right that was involved in such action will be open for consideration in such suit or proceeding, and that as the courts must finally settle the particular controversy, so also will they finally determine the question of constitutional law. For the Constitution of the State is higher in authority than any law, direction, or order made by anybody or any officer assuming to act under it, since such body or officer must exercise a delegated authority, and one that must necessarily be subservient to the instrument by which the delegation is made. In any case of conflict the fundamental law must govern, and the act in conflict with it must be treated as of no legal validity. But no mode has yet been devised by which these questions of conflict are to be discussed and settled as abstract questions, and their determination is necessary or practical only when public or private rights would be affected thereby. They then become the subject of legal controversy; and legal controversies must be settled by the courts. The courts have thus devolved upon them the duty to pass upon the constitutional validity, sometimes of legislative, and sometimes of executive, acts. And as judicial tribunals have authority, not only to judge, but also to enforce their judgments, the result of a decision against the constitutionality of a legislative or executive act will be to render it invalid through the enforcement of the paramount law in the controversy which has raised the question. The same conclusion is reached by stating in consecutive order a few familiar maxims of the law. The administration of public justice is referred to the courts. To perform this duty, the first requisite is to ascertain the facts, and the next to determine the law applicable to such facts. The Constitution is the fundamental law of the state, in opposition to which any other law, or any direction or order, must be inoperative, and void. If, therefore, such other law, direction, or order seems to be applicable to the facts, but on comparison with the fundamental law the latter is found to be in conflict with it, the court, in declaring what the law of the case is, must necessarily determine its validity, and thereby in effect annul it. The right and the power of the courts to do

this are so plain, and the duty to generally—we may almost say universally—conceded, that we should not be justified in ˎwearying the patience of the reader in quoting from the very numerous authorities upon the subject." Cooley, Const. Lim. (7th Ed.) 76-78.

The doctrine thus expounded excludes the idea that the courts are constituted as a reviewing authority over the other departments, or as guardian of the Constitution. This court has more than once refused the role. Baca v. Perez, 8 N. M. 187, 42 P. 162; Kelley v. Marron, 21 N. M. 239, 153 P. 262; Asplund v. Alarid, 29 N. M. 129, 219, P. 786. In the case last mentioned, the doctrine was applied. Former Justice Botts, writing the opinion, thus expressed it:

"It is not the duty of this or any other court to sit in judgment upon the action of the legislative branch of the government, except when the question is presented by a litigant claiming to be adversely affected by the legislative act on the particular ground complained of."

[3] The constitutionality of a statute is not in itself a cause of action, nor a head of equity jurisdiction. Cruickshank v. Bidwell, 176 U. S. 73, 20 S. Ct. 280, 44 L. Ed. 377; Terrace v. Thompson, 263 U. S. 197, 44 S. Ct. 15, 68 L. Ed. 255; Muskrat v. United States, 219 U. S. 346, 31 S. Ct. 250, 55 L. Ed. 246.

So we concluded that, as a citizen, appellant is without standing to question the constitutionality of the act in question, and we proceed to the consideration of the other question, Has a taxpayer such an interest as entitles him to an injunction to restrain devastavit of public funds?

[4] Of course, it is well understood that equity awards its injunctive writ only to prevent irreparable injury for which there is no adequate and complete remedy at law. The injury must consist, to speak broadly, in the invasion of some right of the complaining party. We have here to determine whether appellant's right meets the requirements. We have already decided that he has no right, cognizable by courts, to complain solely of a violation of the Constitution. Such right as he there possesses is political, enforceable only

as other political rights are maintainable. The right we now seek is a legal right. As it is asserted only in connection with his status as a taxpayer, it is a right affecting his property, though the fact that he contributes to the expense of government by enforced contributions in the form of taxes. As already pointed out, it is not satisfactorily shown that appellant will be in any way injuriously affected in his property by the proposed expenditures. Perhaps his failure to show such injury should be deemed decisive. We prefer, however, to assume, for the purposes of this case, that the necessary result of the proposed use of the ''permanent reservoirs for irrigating purposes, income fund,'' will result in increasing state taxes.

It has often been held that a taxpayer may, in the absence of enabling statute, have injunction to prevent devastavit of municipal funds. Such is said by Dillon to be the prevailing rule. He says it may be vindicated upon principle in view of the nature of the powers of municipal corporations, and the analogy in the relations between such corporations and the taxpayers and private corporations and their stockholders. ''It is better,'' he says, ''that those immediately affected by corporate abuses should be armed with the power to interfere directly in their own names than to compel them to reply upon the action of a distant state officer.'' Municipal Corporations (5th Ed.) §§ 1579, 1580.

Whatever may be the merits of this doctrine, and wherever the weight of authority may lie, we consider the taxpayer's right, as against municipal authorities, settled in this jurisdiction. It was expressly declared in Laughlin v. County Commissioners, 3 N. M. 264, 5 P. 817, where Crampton v. Zabriskie, 101 U. S. 601, 25 L. Ed. 1070, was said to be controlling. See, also, case note 36 L. R. A. (N. S.) 1. Since then the right does not seem to have been questioned, and such suits have been maintained in Catron v. County Commissioners, 5 N. M. 203, 21 P. 60, Page v. Gallup, 26 N. M. 239, 191 P. 460, and Asplund v. Alarid, supra.

Granting the foregoing doctrine, does it follow that the taxpayer's right extends, or should extend, so far as ·to maintain injunction against officers of state, in this case the Governor himself? It has often been contended, and some times ruled, that it does. In this jurisdiction we have found three instances in which such a. suit was entertained. There may have been others. But we do not find that the question has ever been decided. Baca v. Perez, supra, was a taxpayer's suit against territorial officers. A demurrer assigned, among other grounds, plaintiff's lack of legal capacity to sue, and want of equity in the bill. The whole of the interesting history of this case does. not appear in the report. The trial judge granted the injunction, and in the opinion he filed sustained the taxpayer's capacity to sue, relying upon Crampton v. Zabriskie and Laughlin v. Commissioners, supra. The Supreme Court reversed the judgment, holding that the demurrer should have been sustained, but apparently on the ground, as shown by the report, that the bill was without equity. In Kelley v. Marron, supra, and in Bryant v. Loan Commissioners, 28 N. M. 319, 211 P. 597, there is no indication that the question was raised. We therefore have, in this state, no controlling precedent, and must decide upon principle and upon such authorities as other jurisdictions afford.

In a note entitled, "Right of citizen or taxpayer to enjoin waste or unlawful expenditure of state funds," L. R. A. 1915D, 178, it is said that such right "seems generally sustained in California, Florida, Hawaii, Illinois, Indiana, Maryland, Oregon, Pennsylvania, and Tennessee, and perhaps in Colorado and Kansas." It is further said: "The action is not allowed in New York, Louisiana, South Dakota, and Washington," and that "the same has been held in a federal court and in Porto Rico." After abstracting decisions from these jurisdictions, other decisions are classified as being "inconclusive or doubtful." The author expresses no view as to which is the better doctrine. Accepting the

correctness of the classification, more jurisdictions are to be counted as supporting appellant's contention.

A leading case is Jones v. Reed, 3 Wash. 57, 27 P. 1067. Noting the conflict of authority as regards restraint of municipal officers, the court admits that the taxpayer's right is supported by the weight of authority, citing Crampton v. Zabriskie, the decision relied upon by our territorial Supreme Court in Laughlin v. County Commissioners, supra. It points out, however, that Crampton v. Zabriskie dealt only with the restraint of municipal officers, and that it had found (1891) no case holding that the doctrine is applicable to state officers, and decides that it may not properly be so applied. The distinction between a state government and municipal corporations is thus pointed out:

"The county is a quasi corporation; the state is a sovereignty. The county only possesses such powers as the Legislature of the state confers upon it. Its revenue, its property, its very existence, depend upon statutory enactment. It can be enlarged, dismembered or annihilated at the will of the state. The state, on the contrary, has all the powers not relinquished to the general government by the articles of federation, and subject to these relinquishments, its sovereignty is supreme. One of the necessary attributes of sovereignty is the protection of the sovereign power and the maintenance of the state organization."

Pointing out the possible results of such a doctrine in frequent and disastrous interference with the machinery of government, the majority of the court concluded:

"Surely such a theory of practice is not in harmony with the genius of our government, nor will authority sanction, or public policy permit, the adoption of a rule which will authorize any number of volunteers who may, rightfully or wrongfully, interpret the laws different from the interpretation put upon them by the officers of the state, to paralyze for a time every or any branch of the state government. It seems to us that there is a difference in principal, and there might be a very great difference in results; and probable results are what the policy of the law is based upon."

The court was able to invoke a Washington statute making it the duty of the Attorney General to enforce the proper application of funds appropriated to the

public institutions of the territory, which it says is to
prevent the results above suggested, and to protect the
interests of the public. As showing the distinction be-
tween interference with the collection and disposition
of the revenues of a municipal corporation and int.·r-
ference with those of a state, the court quotes from the
State Railroad Tax Cases, 92 U. S. 575, 23 L. Ed. 663.

Whatever weight the majority of the court gave to
the statute, it is plain that it considered the claim of
right by a private citizen to enjoin a breach of public
trust by state officials as opposed to the genius of our
government and to public policy. Wherein it is un-
sound policy the court sufficiently indicated. Wherein
it is out of harmony with the genius of our government
is not so clearly stated, but the court no doubt had in
mind the delicate relations existing under our Consti-
tutions among the legislative, the executive, and the
judicial branches, all representative of and exercising,
within their respective spheres, the people's sover-
eignty. For an interesting discussion of the question
from that viewpoint, we turn to Schieffelin v. Kom-
fort, 212 N. Y. 520, 106 N. E. 675, L. R. A. 1915D, 485.
In that case a citizen, resident elector, and taxpayer
sought to enjoin the state board of elections and the
secretary of state from proceeding to the performance
of their statutory duties in connection with the nomina-
tion and election of delegates to a constitutional con-
vention, it being claimed that the statute under which
they were about to proceed was unconstitutional, and
that the expense of the election would be irreparable
injury to taxpayers.

To set forth the argument in Schieffelin v. Komfort
would be to repeat what has been said regarding the
functions and spheres of the several branches of gov-
ernment. We may say, parenthetically, that in most
of the cases concerning the taxpayer's right to enjoin
misapplication of state funds, it is the constitutionality
of the act or proceeding that is questioned. So, in re-
viewing the authorities, it is impossible to keep the
present question clearly distinguished from the ques-

tion we have already disposed of. To return to Schief-felin v. Komfort, it was there said:

"The rights to be affected must be personal as distinguished from the rights in common with the great body of people. Jurisdiction has never been directly conferred upon the courts to supervise the acts of other departments of government. The jurisdiction to declare an act of the Legislature unconstitutional arises because it is the province and duty of the Judicial Department of government to declare the law in the determination of the individual rights of the parties. The assumption of jurisdiction in any other case would be an interference by one department of government with another department of government when each is equally independent within the powers conferred upon it by the Constitution itself." In re Guden, 171 N. Y. 529, 64 N. E. 451.

In the course of the opinion the court notes, with disfavor, "the tendency in some states to assert jurisdiction in the courts to review the acts of independent branches of government." In approving the principles upon which this case was decided, we do not overlook the fact that the New York courts are among those which never admitted the jurisdiction of equity to enjoin. at the suit of a taxpayer, misapplication even of municipal funds, until such jurisdiction was conferred by statute. Long v. Johnson, 70 Misc. Rep. 308, 127 N. Y. S. 756. More recent Washington decisions are Birmingham v. Cheetham, 19 Wash. 657, 54 P. 37, Tacoma v. Bridges, 25 Wash. 221, 65 P. 186, and Bilger v. State, 63 Wash. 457, 116 P. 19. Sutton v. Buie, 136 La. 234, 66 So. 956, L. R. A. 1915D, 178, is in line with Jones v. Reed and Schieffelin v. Komfort, supra.

In Morgan v. Graham, 1 Woods, 124, 17 Fed. Cas. 749, No. 9,801, Mr. Justice Bradley, sitting as a circuit justice, refused to a taxpayer an injunction to restrain the Governor and other state officials from issuing state bonds in alleged violation of the Constitution. He said:

"The proper administration of the government in its several departments cannot be enforced by private actions brought by any taxpayer or any voter interested in good government of the country. Without attempting to decide what remedy other than the force of public opinion, and liability to impeachment, may exist for the wrong

which the complainant supposes is about to be committed; whether the bonds that may be issued will be void in the hands of the holders thereof; or whether the donee company may not hereafter be compelled to disgorge the money it may receive therefrom; it is sufficient to say in deciding this case that the complainant does not show any title to the relief which he seeks."

An interesting and able opinion supporting the views of Jones v. Reed, supra, was rendered in Navarro v. Post, by Judge B. S. Rodey, of the United States District Court for Porto Rico, reported in 5 Porto Rico Federal Reporter, 61. See, also, Scott v. Frazier (D. C.) 258 F. 669.

Pomeroy quotes, with approval, from Jones v. Reed, and concludes:

"Hence it would seem that an injunction should not issue against state officers unless some special and direct injury to the plaintiff is shown."

He cites a number of cases not noticed here. To the contrary, he cites Mott v. Pa. R. R. Co., 30 Pa. 9, 72 Am. Dec. 664, Burke v. Snively, 208 Ill. 328, 70 N. E. 327, and State v. Hall, 25 N. D. 85, 141 N. W. 124, hereinafter noticed. Pomeroy's Equity Jur. § 1748.

In a note to Story's Eq. Jur. (14th Ed.) § 14, it is said:

"Injunction is not a remedy which may be invoked by the citizen for the purpose of controlling public officers or tribunals in the exercise of their functions. In order to sustain it, the plaintiff must show that he has a special interest, in respect to which he will suffer special injury. It is not enough that the community in which he resides will be injuriously affected by some governmental or legislative action."

High in his work on Injunctions (section 1329a), says:

"A federal court sitting in equity may enjoin officers of a state from proceeding to execute or from otherwise doing acts under an unconstitutional law of the state where the attempted enforcement of the invalid statute will result in irreparable injury to the plaintiff for which there is no adequate remedy at law. But where relief is sought against the enforcement of an unconstitutional statute, either state or federal, the unconstitutionality of the law is not alone sufficient to justify the granting of the writ,

but irreparable injury must also be alleged and clearly proven, or some other special circumstance must be shown which brings the case under some recognized head of equity jurisdiction. And where the plaintiff fails to make such a showing, the relief will be denied and he will be left to his remedy at law."

The Attorney General has cited King County v. Seattle School District, 263 U. S. 361, 44 S. Ct. 127, 68 L. Ed. 339, but it is not clear that the court there decided the question.

. We come now to those decisions which are classified as supporting the taxpayer's right, and others which have come to our attention holding likewise.

Livermore v. Waite, 102 Cal. 113, 36 P. 424, 25 L. R. A. 312, was a suit by a citizen and taxpayer to restrain the secretary of state from incurring expense in submitting a constitutional amendment, which, it was claimed, had not properly passed the Legislature, and which, if adopted by the people, would be inoperative. The relief was granted, but the question of the taxpayer's right to invoke the relief was not discussed, nor does it appear to have been raised. This case no more commits California on the question than the New Mexico cases, mentioned, supra, commit this court.

Frost v. Thomas, 26 Colo. 222, 56 P. 899, 77 Am. St. Rep. 259, seems to have been misclassified in the note. Just who the plaintiffs were and what interests they asserted does not appear. But the court refused to entertain their suit to restrain the Governor from appointing the officers for a county newly established under an alleged unconstitutional statute. The reasoning of the court is entirely in accord with that of Schieffelin v. Komfort, supra, and the result reached is the same.

Later, however, the Colorado Supreme Court, in Leckenby v. Post Printing & Publishing Co., 65 Colo. 443, 176 P. 490, upheld the taxpayer's right. Answering the argument contra, it said:

"* * * We are committed to a contrary doctrine in

Asplund v. Hannett et al., 31 N. M. 641

regard to municipal and county officers, and we see no legitimate distinction in state officials."

As a weight of authority supporting the decision, the court cited numerous cases, many of which we herein mention.

In Hawaii the taxpayer's right to restrain the unlawful issuance of bonds by a cabinet minister was declared in Castle v. Kapena, 5 Haw. 27, although that was not the relief sought. Mandamus was sought and denied, because injunction was deemed the proper remedy. So far as the court relied upon authority, it was American cases, which upheld the taxpayer's right to restrain municipal officers, and English cases upholding mandamus against cabinet ministers. In the later case of Castle v. Secretary of the Territory, 16 Haw. 769, a taxpayer sought to enjoin the secretary of the territory from any expenditure in connection with the election of county officers under an alleged unconstitutional act. The availability of the remedy to a taxpayer was declared to be settled for that jurisdiction in Castle v. Kapena, but, in any event, to be clear under Crampton v. Zabriskie, supra. The court also cited Larcom v. Olin, 160 Mass. 102, 35 N. E. 113, where, both madamus and injunction having been prayed, the court denied the injunction, saying:

"It is not within the general powers of the court of equity to supervise the conduct of public officers in the performance of their official duties, or to prohibit such officers from acting, or to compel them to act, in matters which concern political and personal rights as distinguished from rights of property."

The Kansas cases, Martin v. Ingham, 38 Kan. 641, 17 P. 162, and Martin v. Lacy, 39 Kan. 703, 18 P. 951, are not considered in point. They discussed only the question of jurisdiction to control, by mandamus or injunction, the ministerial acts of the Governor. Interest necessary to qualify the plaintiff was not considered in the earlier case, and in the later the Governor waived it.

In Christmas v. Warfield, 105 Md. 536, 66 A. 491, the

sufficiency of the taxpayer's interest was asserted without discussion or citation of authority. The same may be said of Mott v. Pa. R. R. Co., 30 Pa. 9, 72 Am. Dec. 664.

Ellingham v. Dye, 178 Ind. 336, 99 N. E. 1, Ann. Cas. 1915C, 200, is a case of surpassing interest as regards the principal questions decided. With respect to a taxpayer's interest to qualify him as a complaining party, the decision is based on former rulings in Indiana, none of which involved injunction of a state officer, and some of which concerned mandamus in the name of the state. The later decision in Bennett v. Jackson, 186 Ind. 533, 116 N. E. 921, merely follows the earlier.

In Crawford v. Gilchrist, 64 Fla. 41, 59 So. 963, Ann. Cas. 1914B, 916, the court took the view that the writs of mandamus and injunction are correlative, citing Board of Liquidation v. McComb, 92 U. S. 531, 23 L. Ed. 623, and that since a state officer might be compelled, by mandamus, to perform a purely ministerial act, he might likewise be restrained, by injunction, from performing a ministerial act to which he was directed by an unconstitutional statute. The decision that the taxpayer might maintain such suit is based upon the ministerial character of the acts sought to be enjoined, the general interest to the people of the state, and the lack of adequate remedy at law. The authorities cited are Ellingham v. Dye, already noticed, and State v. Cunningham, 83 Wis. 90, 53 N. W. 35, 17 L. R. A. 145, 35 Am. St. Rep. 27.

State v. Cunningham, just mentioned, is an interesting case, but it does not bear upon the question here being considered—whether a taxpayer in his own name and right may enjoin officers of state. There, concededly, the question was publici juris. The relator could show no private interest. That mandamus and injunction were correlative writs was asserted only with respect to their use by the Supreme Court in the exercise of its constitution original jurisdiction. The argument

was that the design was to give the Supreme Court
"original jurisdiction of all judicial questions affect-
ing the sovreignty of the state, its franchises and pre-
rogatives, or the liberties of the people." That being
the purpose, and injunction being one of the writs au-
thorized for the purpose, it must be considered, when
so sued, a quasi prerogative writ correlative with man-
damus. But the court says it is firmly established
that:

> "In matters strictly publici juris, in which no one citizen
> has any right or interest other than that which is com-
> mon to citizens in general, a petition by a private person
> for leave to commence an action in this court in the
> name of the state cannot properly be considered until the
> Attorney General has been requested to move in the mat-
> ter, and has refused or unreasonably delayed to do so."

As the title suggests, the citizen did not assume to
proceed in his own name. He did employ the name of
the state after the Attorney General had refused to
move and he had received permission from the court.
The real question was whether the Attorney General,
or the court itself, controlled the matter of the use of
the state's name, in an application for a prerogative
writ. No one claimed that the citizen could proceed in
his own name and right.

In State v. Frear, 148 Wis. 456, 134 N. W. 673, 135
N. W. 164, L. R. A. 1915B, 569, 606, Ann. Cas. 1913A,
1147, previous Wisconsin decisions are reviewed and
classified. It is there plainly laid down that only as its
use is authorized by the Supreme Court in the exercise
of its original jurisdiction is injunction a prerogative
writ; that in the circuit courts injunction is a mere
equitable remedy for vindication of private rights; that
the Cunningham Case has no bearing at all on the
question of the right of a taxpayer, by virtue of his
equitable interest in state funds, to maintain a suit to
enjoin their misapplication by state officers. While
the majority deemed it unnecessary to consider that
question, Mr. Justice Timlin, dissenting in part, covers
it with great ability and thoroughness, and rejects all

theories upon which such a suit has been held maintainable.

State ex rel. Cranner v. Thorson, 9 S. D. 149, 68 N. W. 202, 33 L. R. A. 582; White Eagle Oil & Refining Co. v. Gunderson (S. D.) 205 N. W. 614, 43 A. L. R. 397, are cases involving, like the Wisconsin case, the original jurisdiction of the Supreme Court.

In Burke v. Snively, 208 Ill. 328, 70 N. E. 327, there is nothing to indicate any question raised as to the right of the plaintiff to sue. The question discussed was whether it was a suit against the state. However, in the more recent case of Fergus v. Russel, 270 Ill. 304, 110 N. E. 130, Ann. Cas. 1916B, 1120, the question was decided. The majority of the court was unable to distinguish between state and municipal funds and property as respects a taxpayer's interest. Nor did it recognize a distinction between the state and municipalities in the matter of the exercise of sovereignty. In the matter of taxation, it held, the municipality exercises a part of the state's sovereignty, and so the difference is only in degree. As in many of the cases, there was a strong dissenting opinion. Mr. Justice Gray reviewed previous Illinois decisions, and shows the serious nature of the step the courts take in extending the doctrine of a taxpayer's right to enjoin municipal expenditures to include control in equity of state expenditures.

State v. Hall, 25 N. D. 85, 141 N. W. 124, was decided on the authority of State v. Blaisdell, 18 N. D. 55, 118 N. W. 141, 24 L. R. A. (N. S.) 465, 138 Am. St. Rep, 741, and cited also Frame v. Felix, 167 Pa. 47, 31 A. 375, 27 L. R. A. 802, which the court remarked was directly in point. State v. Blaisdell, like State ex rel. Cunningham, did not invoke the question of the taxpayer's right to sue in his own name, but only his right as a relator to use the name of the state, the Attorney General having refused to move. Frame v. Felix involves simply the taxpayer's right to enjoin municipal officers.

In Lynn v. Polk, 8 Lea (Tenn.) 122, the majority rely on the authority of cases not involving state officers, the fallacy of which is pointed out by Ewing, Special Judge, in a dissenting opinion. The other cases relied on were Mott v. Pa. R. R. Co., supra, and Galloway v. Jenkins and the Chatham R. R. Co., 63 N. C. 147. In the latter case, jurisdiction was admitted by the parties.

In Hill v. Rae, 52 Mont. 378, 158 P. 826, L. R. A. 1917A, 495, Ann. Cas. 1917E, 210, taxpawer's right to maintain such a suit is said to have been established by a long line of decisions extending from Chumasero v. Potts, 2 Mont. 242, to Poe v. Sheridan County, 52 Mont. 279, 157 P. 185. The two cases cited and those therein cited do not seem to involve the question nor the principles we are here concerned with. A number of them involved the original jurisdiction of the Supreme Court in prerogative matters, as to which, in State v. Moran, 24 Mont. 433, 63 P. 390, the court took the Wisconsin view that the writ of injunction "is the equity arm of the court's original jurisdiction, and that it with the other writs granted, fully arm and equip the court as a court of first resort on all judicial questions affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of the people."

In Terrell v. Middleton (Tex. Civ. App.) 187 S. W. 367, the right of a taxpayer to enjoin the comptroller of public accounts from issuing warrants covering illegal expenditure of state funds was sustained on the authority of Crampton v. Zabriskie, supra, and City of Austin v. McCall, 95 Tex. 565, 68 S. W. 791, and without recognizing or suggesting any possible distinction between enjoining municipal and state officers.

In Farrel v. Oliver, 146 Ark. 599, 226 S. W. 529, the decision is based on a statute, and upon authority in the absence of statute, citing Fergus v. Russel, supra. And this decision is followed and cited in Green v. Jones, 164 Ark. 118, 261 S. W. 43. Fahey v. Hackmann, 291 Mo. 351, 237 S. W. 752, upholds the taxpayer's

right on authority, citing two cases against cities. In Fischer v. Marsh, 113 Neb. 153, 202 N. W. 422, the tax-payer's right was upheld, on authority of earlier decisions of that court, none of which was against state officers.

Where the courts have discussed, on principle, the taxpayer's right to enjoin waste or misapplication of state funds, we find generally that they have been influenced by the lack of any other remedy or by the supposed duty of the court always to check a threatened violation of the Constitution.

The lack of other remedy is not sufficient. True, lack of an adequate remedy at law is essential to the jurisdiction of equity in injunction, but it does not in itself give rise to it. The party seeking the relief must have a right in respect to which he is threatened with irreparable injury. So the existence of the right is as essential as the lack of other remedy. There are many rights for which the citizen must look to the other branches of his government, and which it is not within the power of the courts to secure to him. To vindicate such rights his remedies are political.

Enough has already been said of the mistaken view that the judiciary alone is responsible for the upholding of the Constitution. Within our own field we have that responsibility. But if we invade those of the legislative or of the executive, we ourselves become violators of the fundamental law.

It has seemed to some courts an important consideration that the Attorney General (the public's law officer) could not be expected, because of his position or affiliation, to intervene in the public behalf, or that he had actually appeared in opposition. This, it seems to us, is not a matter for consideration. What may be the Attorney General's right or duty in the premises cannot be decisive. Even if the Constitution and statutes have failed to provide for any remedy, it is not for the

courts to create one.    As said in Long v. Johnson,
supra:

> "It is true that the doctrine that redress of alleged pub-
> lic wrongs must be sought only through the state or its
> law officers and not by an individual receiver, as suggested
> by the attorney for the plaintiff here—a somewhat severe
> jolt, when as in this case actual or proposed wrongdoing
> is alleged against a state commission and the Attorney
> General appears in the defense of the officials attacked;
> nevertheless, courts must proceed according to the existing
> statutes and decisions and new remedies, if desirable, must
> be furnished by the Legislature."

The cases which we have examined involve many
other points than that we have under consideration—
the ministerial or discretionary character of the offi-
cial duty, whether it is a suit against the state, whether
the same principles apply in injunction and mandamus.
In most of them the constitutionality of statutes is in-
volved along with the question of the taxpayer's in-
jury, because of the illegal expenditure.    Different
constitutional and statutory provisions are under con-
sideration bearing upon all of these questions.    Any-
thing like an analysis it would be impracticable for us
to attempt.    We are satisfied, however, that the in-
junction here prayed for is the ordinary equitable writ
and remedy.    Whatever may be its nature when orig-
inally granted in the Supreme Court, issued from the
district court, it is not a prerogative nor a quasi pre-
rogative writ.    It is a private remedy for the protection
of individual rights, except as the state may have oc-
casion to appear as plaintiff.    An individual, to invoke
the remedy, must have legal or equitable rights to be
protected.    A right which he shares, as a taxpayer, in
common with all other taxpayers, is not such an in-
dividual right as qualifies him, under general princi-
ples, to relief by injunction.    Exception has been made
where the threatened injury to taxpayers consists in
devastavit of municipal funds.    This exception is per-
haps better supported by practical considerations than
on principle.    A minority of courts consider it enlarge-
ment of equity jurisdiction by judicial decison.    Even
so, it does not run counter to any fundamental principle

of government. But to extend the doctrine so as to entertain a private suit to restrain the acts of a co-ordinate branch of the government, the injurious effects of which acts are public only, we cannot regard otherwise than as usurpation of power not conferred.

It is true that there is an analogy between the state and a municipal corporation, and an analogy between a municipal corporation and a private corporation. Hence, on the mathematical principle that things equal to the same thing are equal to each other, a number of courts have concluded that the rule applied to municipal corporations should be applied to the state. They overlook the dual nature of municipal corporations as agencies of sovereignty and as business corporations. The analogy between them and private corporations appears only as we view them in their business and property-owning capacity. When viewed as repositories of sovereign power, the analogy ceases. But the analogy is the foundation supporting the doctrine of taxpayers' suits. We have not been accustomed to recognize any such dual nature of the state. Its business is conducted in its sovereign capacity. The bridge which joins the private corporation and the municipal corporation, and enables the taxpayer to make that crossing, breaks down between the municipal corporation and the state.

Not having found any legal or logical principle to support a taxpayer's suit to enjoin the expenditure of state funds, we are constrained to hold that he has no such right in this state. We hold to this view notwithstanding the contrary conclusion of eminent judges and able courts, and an apparently increasing tendency to admit the right.

[5] Appellant urges that by the compact—the Enabling Act on the one hand and the Constitution on the other—an express trust is created; that such relation necessarily involves a donor, trustee, and a cestui que trust; that the United States is the donor, the state the trustee, and the citizens of the state the cestui; that

jurisdiction resides in a court of equity to enforce a trust at the behest of either the donor or the cestui; and that, as one of the cestuis, he is entitled to maintain his suit. The argument is not without force; yet we think it fallacious. When a trust is committed to a state, it must be in view of the fact that the trustee is constituted with three co-ordinate governmental branches. The execution of the trust is committed to all three within their respective spheres. In so far as it requires legislation, it is for the Legislature. Administrative measures, discretionary or ministerial, may be left to the executive. Construction is for the courts. This does not mean that the courts may assume to direct other branches in their duties unless the occasion arises for the exercise of their peculiar functions. No doubt the trust was created, in part at least, for the general benefit of the people of this state—the New Mexico public. It was not created for the particular benefit of the appellant. Whatever appellant's interest, it is but a part of the public interest. It is often said that the possession and control of state property and funds is a public trust. So it is. But, by the better view, as we have sought to show, that does not entitle the individual to resort to equity in his own name and right to enforce it.

[6] Appellant contends that under sections 4110-4114, Code of 1915, the want of legal capacity to sue appearing upon the face of the complaint is ground for demurrer, and that by failing to make the objection until now appellees have waived it. We think, however, that the objection here made is, in legal effect, that the complaint does not state facts sufficient to constitute a cause of action. Such objection may always be raised. Code 1915, § 4114; Canavan v. Canavan, 17 N. M. 503, 131 P. 493, Ann. Cas. 1915B, 1064.

In Birmingham v. Cheetham, 19 Wash. 657, 54 P. 37, this objection was raised and thus disposed of:

"Section 189 of the Code of Procedure provides that the defendant may demur to the complaint when it appears upon the face thereof '(2) that the plaintiff has no legal

capacity to sue,' or '(6) that the complaint does not state facts sufficient to constitute a cause of action.' Each of the grounds of demurrer specified by this section is separate and distinct from all others, and has no relation whatever to any other; and we therefore entirely agree with the contention of counsel for the appellant that the question of want of legal capacity to sue was not raised by this demurrer in the court below, and therefore cannot be considered in this court. But it does not necessarily follow from this that the judgment must be reversed. On the contrary, if it appears that the complaint does not state a cause of action against the several defendants, the judgment must be affirmed, regardless of the reason upon which it was based by the trial court. Every complaint, in order to state a cause of action, must show some primary right possessed by the plaintiff and some corresponding duty resting upon the defendant, and that such right has been invaded and such duty violated by some wrongful act or omission on the part of the defendant. Pomeroy, Code Remedies (3rd Ed.) § 519. Tested by this fundamental rule, it seems perfectly clear to us that no case for an injunction is made against the chief grain inspector."

It results, therefore, that the Attorney General's position is well taken, and that his motion to dismiss the appeal must be sustained. The former opinion, in view of this conclusion, will be withdrawn.

It is so ordered.

PARKER, C. J., and BICKLEY, J., concur.